[No. F067666. Fifth Dist. Apr. 20, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL RAYMOND McENTIRE et al., Defendants and Appellants.

## Counsel

Steven S. Lubliner, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Raymond McEntire.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant Manuel Martinez Rodriguez.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Peter H. Smith and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## PEÑA, J.—

### INTRODUCTION

A resident is home alone lying on her couch. Her dog barks. The resident looks out to her backyard and sees a male intruder there. The intruder approaches the home and tries to open the sliding glass door, which is beyond the door's screen. The resident picks up her dog and her wireless phone. She dials 911. Shortly after fleeing her home to the front yard, she hears glass shatter. Does sufficient evidence support the finding the resident was present during the commission of the burglary? We conclude it does, even though the screen was partially open, because the intruder penetrated the space beyond the screen in attempting to open the sliding glass door while the resident was still inside her home.

Defendants Daniel Raymond McEntire and Manuel Martinez Rodriguez were jointly tried and convicted by a jury of the following offenses: first degree residential burglary (Pen. Code, §§ 459, 460, subd. (a); count 1),[1] possession of a firearm by a felon (§ 29800, subd. (a)(1); counts 2 and 3), unlawful possession of ammunition (§ 30305, subd. (a); counts 4 and 5), carrying a concealed firearm in a vehicle (§ 25400, subd. (a)(3); counts 6 and 7), and active participation in a criminal street gang (§ 186.22, subd. (a); count 8). In addition, Rodriguez was convicted of resisting a peace officer, a misdemeanor (§ 148, subd. (a)(1); count 9).

The jury found true a gang enhancement on counts 1 through 7 as to both defendants (§ 186.22, subd. (b)(1)). Rodriguez also admitted a prior prison term (§ 667.5, subd. (b)). Rodriguez was sentenced to an aggregate term of 16 years 8 months in state prison and McEntire was sentenced to 15 years 8 months.

Defendants jointly make the following claims on appeal: (1) insufficient evidence supports the substantive gang charge (count 8); (2) insufficient

---

[1] All undesignated statutory references are to the Penal Code unless otherwise indicated.

evidence supports the gang enhancements on counts 1 through 7; (3) insufficient evidence supports the jury's finding a nonparticipant was present during the commission of the burglary; (4) the trial court erred in instructing the jury regarding the presence of a nonparticipant during the burglary; (5) the trial court erred in failing to define "present during the commission of a burglary" sua sponte; (6) the trial court erred in failing to define "in association with a criminal street gang" sua sponte; (7) the trial court erred in denying defendants' motion to bifurcate the gang enhancement allegations; and, (8) defendants' sentences for unlawful possession of ammunition (counts 4 and 5) must be stayed pursuant to section 654. We agree with defendants' claim counts 4 and 5 must be stayed. In all other respects, the judgment is affirmed.

## FACTS

On August 28, 2012, at approximately 8:14 a.m., Veronica Beltran was lying on a sofa in her living room when her dog started barking. Beltran looked outside her window and saw a man, McEntire, in her backyard. She assumed McEntire was a gardener or a Pacific Gas and Electric Company meter reader, closed her curtains, and lay back down.

Beltran testified McEntire approached the home and tried to pull open the living room sliding glass door. He was wearing a hooded sweatshirt, jeans, white shoes with a black stripe, yellow gloves, a backpack, and a mask. Beltran dialed 911 from a wireless phone. As she picked up her dog to run outside, she made eye contact with McEntire for a few seconds.

Beltran ran outside her front door and crossed the street in front of her home. Based on the sound of glass being shattered, she told the 911 operator the man had entered her home.

As she ran back across the street to find help, Beltran saw a white van parked by the side of her home. A man sitting in the driver's seat got out of the vehicle and asked her what was wrong. Beltran later realized the man, Rodriguez, was her husband's cousin, whom she knew as Manuel or "Peanut." Beltran told Rodriguez to leave and informed him she had called the police. Rodriguez approached the fence of Beltran's backyard and yelled, " 'Hey, Dog. Come on. Let's go. She is already out here. We got to go.' " Rodriguez then walked toward the front of the home and Beltran lost sight of him.

After a few moments, McEntire walked over to the van from the front of the home, got into the driver's seat, and backed the van into Beltran's driveway. He got out of the vehicle and disappeared from Beltran's sight.

After an unspecified period of time, McEntire got back inside the van, and picked up Rodriguez, who had begun walking down the street. They drove away.

Frank Nelson of the Fresno Police Department responded to the incident. He conducted a walk-through of the home with Beltran. They observed the exterior screen door on Beltran's dual pane sliding glass door had been pulled off its track, and the door's exterior glass pane had been shattered and separated from the interior glass pane. In the master bedroom, the doors to an armoire were opened and the bottom drawers were pulled out. Jewelry boxes had also been opened. A door from the interior of the house leading to the garage had been opened. Beltran noted an iPhone was missing from her home.

Shortly thereafter, Fresno police officers saw a white van matching the description of the suspects' vehicle traveling on a frontage road parallel to Highway 99. Officer Tharen Higgenbotham followed the van and activated his emergency lights and siren, but the vehicle did not stop. When the vehicle reached a dead end, Rodriguez exited the van and ran. He stopped after he was threatened with a police dog (K-9) warning.

Pursuant to an in-field identification, Beltran identified McEntire as the man who broke into her home and Rodriguez as the man she encountered sitting in the van parked on the street. Beltran recognized Rodriguez, in part, because of his physique and because he was wearing a red, black, and white jersey with a number on it. She recognized McEntire, who was wearing a mask during the burglary, based on his size, as well as on his sweatshirt and shoes.

Police searched the van and found a .357 Magnum revolver with six cartridges in the cylinder; a nine-millimeter semiautomatic handgun loaded with 10 rounds; a gray Fresno State Bulldog hooded sweatshirt; a red, black, and white Chicago Bulls jersey with the lettering "Bulls 1" on the front and "Rose 1" on the back. After a second search of the vehicle, police found a pair of yellow dishwashing gloves. McEntire was listed as the vehicle's registered owner.

During police questioning, Rodriguez told detectives he was a member of the East Side Bulldog gang and had been since 11th grade. He initially denied being present at the scene of the burglary, but later acknowledged he was there and had encountered Beltran outside of her home. He claimed he left when Beltran told him she called the police.

*Gang Evidence*

*Prosecution*

Fresno County Sheriff's Detective Eric Cervantes, an expert on Bulldog street gangs, testified for the prosecution. According to Cervantes, the Bulldogs have six major sects in Fresno, and the Fifth Street Bulldogs are a subset of the Bulldogs.

He explained Bulldog gang members originally wore red, but have more recently begun wearing black and white, or gray. They often wear clothing with the Fresno State Bulldog logo, as well as Chicago Bulls jerseys. Members of the Fifth Street Bulldog gang wear the same colors and symbols as the main Bulldog gang, but Fifth Street Bulldogs frequently use the number "5." Cervantes testified members of the Bulldogs call each other "dog," and the phrase "What's up, dog?" is a common gang greeting.

The primary activities of the Fifth Street Bulldog gang include grand theft, assault with a deadly weapon, and possession of a firearm by a felon. Based on convictions of several self-identified members of the gang of the foregoing offenses, Cervantes opined the Fifth Street Bulldog gang was involved in an ongoing pattern of criminal activity.

In determining whether an individual is an active gang member, Cervantes explained he looks at multiple indicators, including jail classifications; tattoos; whether an individual has been arrested with other gang members; documented associations with other known gang members; showing ("throwing") of gang signs; whether the individual wears or owns gang clothing; information from reliable sources, such as family members or significant others; the possession of items containing gang graffiti; and lists gang members possess that include the names of other gang members.

Cervantes opined both Rodriguez and McEntire were active members of the Fifth Street Bulldog gang based on multiple indicators. Rodriguez had several prominent gang tattoos, including a large number "5" on his neck, "Fresno" on his back, "5th" on his forearm, "FS" on another part of his forearm, a bulldog face on the bottom of his wrist, and a dog paw on the right side of his face next to his eye. Rodriguez was classified by Fresno County jail officials as a member of the Bulldogs nine times between 2003 and 2012, and his girlfriend of seven years told police he was a member of the Bulldogs. Cervantes also formed his opinion based on a photograph of Rodriguez holding a sawed-off shotgun and flashing a gang sign. He found it significant Rodriguez was wearing a Chicago Bulls jersey during the commission of the burglary because Bulldogs wear Chicago Bulls jerseys.

McEntire had a large dog collar tattooed around his neck with the words "Dred Dog" below the collar. In addition, the Bulldog emblem was tattooed on his back above the letters "ESF" (East Side Fresno), and the word "Fresno" was tattooed across his chest. McEntire had been classified by jail officials as a Fifth Street Bulldog on five occasions between January 2007 and October 2012. An officer from a multiagency gang task force also identified McEntire as a member of the Fifth Street Bulldog gang. Cervantes stated he observed a photograph of McEntire kneeling in front of 15 known Bulldog gang members. In the photograph, McEntire was wearing a Chicago Bulls jersey and throwing a gang sign.

Based on a hypothetical premised on the facts of the instant case, Cervantes concluded two gang members whose conduct mirrored Rodriguez's and McEntire's would be "associating together to commit the crime of residential burglary." He stated both gang members would be actively assisting each other in a burglary because one gang member was acting as a lookout while the other broke into the home. Cervantes found it particularly significant one of the perpetrators called the other "dog" during the burglary. He explained: "That statement is huge, because Bulldog gang members refer to each other as dog . . . . In this case, he says, 'Hey, Dog. She's out here.' " He also based his conclusion on gang-related clothing discovered in the vehicle used in the commission of the burglary.

In response to another hypothetical, Cervantes testified the guns were also possessed in association with a criminal street gang, based on the individuals inside the vehicle and the gang clothing found between the driver and passenger seats, underneath the loaded firearms.

*Defense*

Michael Fitzgerald, an expert in Fresno criminal street gangs, testified for the defense. In his opinion, Rodriguez and McEntire were not active gang members.

Fitzgerald based his opinion on a lack of documented contacts between defendants and other active gang members. If defendants were active, he would expect to see more contacts with law enforcement. With respect to jail classifications, he explained former gang members often want to avoid being housed with members of other gangs for safety reasons, so many gang members are active when they are in jail.

Fitzgerald stated "dog" is a common nickname among non-gang members, including law enforcement officers. According to Fitzgerald, although tattoos are a good indicator of gang membership, this is not always the case because

tattoo removal treatments are costly, and free tattoo removal programs have lengthy waiting lists. Assuming the undated photographs of defendants were a few years old, Fitzgerald stated it would not substantiate the fact they were currently active gang members.

## DISCUSSION

1., 2.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

3. *Sufficiency of Evidence to Support Presence of Nonparticipant During Commission of the Burglary*

Defendants argue the 10-year violent felony enhancement imposed pursuant to section 186.22, subdivision (b)(1)(C) must be stricken because the evidence failed to demonstrate Beltran was inside the residence during the commission of the burglary. The Attorney General concedes Beltran fled her home before McEntire entered her sliding glass door, but contends the enhancement applies because "McEntire had penetrated the outer boundary of the residence by crossing the threshold beyond the exterior screen door while Beltran was still inside." We agree with the Attorney General and conclude the enhancement applies.

■ Section 186.22, subdivision (b)(1)(C) imposes a 10-year enhancement when a defendant commits a violent felony "for the benefit of, at the direction of, or in association with any criminal street gang." A "violent felony," as defined within section 667.5, subdivision (c) includes the commission of first degree burglary when a nonparticipant is "present in the residence during the commission of the burglary." (§ 667.5, subd. (c)(21).) In unpublished part 2, we concluded the instant crimes were committed in association with a criminal street gang. Here, we address whether the burglary was a violent felony.

■ First degree burglary occurs when a person enters an inhabited dwelling with the intent to commit a felony. (§§ 459, 460.) " '[A] burglary is complete upon the slightest partial entry of any kind, with the requisite intent . . . .' " (*People v. Valencia* (2002) 28 Cal.4th 1, 8 [120 Cal.Rptr.2d 131, 46 P.3d 920] (*Valencia*), disapproved on other grounds in *People v. Yarbrough* (2012) 54 Cal.4th 889, 894 [144 Cal.Rptr.3d 164, 281 P.3d 68].)

In *People v. Nible* (1988) 200 Cal.App.3d 838, 844–845 [246 Cal.Rptr. 119, 247 Cal.Rptr. 396] (*Nible*), the appellate court considered whether the

---

*See footnote, *ante*, page 484.

defendant's opening of a screen window without penetration of the glass window beyond was sufficient to constitute a burglarious entry. The defendant attempted to remove a screen from outside the victim's open bedroom window using a screwdriver to pry the screen from its frame. (*Id.* at pp. 842–843.) The victim caught the defendant before he could penetrate the space beyond the open window. (*Id.* at p. 842.)

The *Nible* court held penetration of a screen without penetration of a glass window beyond is an entry for purposes of burglary, because a window screen is a permanent part of a dwelling and affords a reasonable expectation of protection from intrusion. (*Nible, supra,* 200 Cal.App.3d at p. 845.) The court found the fact the victim's glass window was open irrelevant: "[E]ven an open door or window affords some expectation of protection from unauthorized intrusion because reasonable persons understand the social convention that portals may not be crossed without permission from the structure's owner." (*Id.* at p. 844.) The purpose behind burglary laws, the court observed, is to protect inhabitants against dangers caused by unauthorized entry, and "inhabitants of a building are just as likely to react violently to an intruder's penetration of their window screen as to the penetration of the window itself." (*Id.* at p. 845.)

■ Our Supreme Court approved the holding of *Nible* in *Valencia, supra,* 28 Cal.4th 1, and set forth a test to determine what constitutes the outer boundary of a building for purposes of burglary. The test is "whether a reasonable person would believe that the element of the building in question enclosed an area into which a member of the general public could not pass without authorization." (*Id.* at p. 12.)

■ Because a screen door encloses such an area, we find sufficient evidence supports the jury's finding Beltran was present during the commission of the burglary. Beltran testified she was in her living room when McEntire began yanking on her sliding glass door. She remained in her home long enough to make eye contact with McEntire for a few seconds before she fled. Based on her testimony, McEntire's hand penetrated the portal of the sliding screen door while she was still in the home. Further, contrary to Rodriguez's assertion, we find no suggestion in the 911 transcripts that Beltran fled the residence before McEntire began pulling at the handle of the glass door. Although this penetration was slight, and only briefly overlapped with Beltran's presence, it is sufficient.

Defendants assert *Nible* and *Valencia* are inapposite to the instant case because the defendants in both cases removed a window screen. Here, the sliding screen door was already open before McEntire entered Beltran's backyard. The thrust of their argument is this: a homeowner does not have a

reasonable expectation of protection from an unauthorized intrusion unless he or she closes the screen door.

We fail to see how the position of the screen door—which is a permanent part of the dwelling—makes any difference as to whether a burglarious entry has occurred. Although *Nible* did state the homeowner's reasonable expectation of protection from unauthorized entry was especially valid under the facts before it because the defendant had to use a screwdriver to pry the window screen from its frame (*Nible, supra*, 200 Cal.App.3d at p. 845), we do not read *Nible* or its progeny to mean an open screen provides no expectation of protection.

A burglarious entry may occur when an intruder penetrates the space beyond a door or a window whether it is open or closed, because a reasonable person would understand such portals may not be crossed without permission from the owner. (*Nible, supra*, 200 Cal.App.3d at p. 844.) A reasonable person would also understand a window screen encloses an area into which a member of the public could not pass without authorization. (*Valencia, supra*, 28 Cal.4th at p. 12.) Accordingly, if a door need not be closed when an intruder penetrates the space behind it to constitute a burglarious entry, why must a screen door be?

To hold as much would contravene the general purpose of burglary laws. " 'Burglary laws are based primarily upon a recognition of the dangers to personal safety[,] . . . the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime . . . and the danger that the occupants will in anger or panic react violently to the invasion . . . .' " (*People v. Gauze* (1975) 15 Cal.3d 709, 715 [125 Cal.Rptr. 773, 542 P.2d 1365].) Indeed, the only reason Beltran fled her home before McEntire was able to access the inner part of her residence was because she happened to be in her living room and saw him yanking at the sliding glass door. Had she not seen him, a violent confrontation may have ensued, a possibility she reflected upon during her 911 call: "Oh my God, if I would've stayed inside." Rather than leave out the front door for safety, a different resident might have retrieved a loaded firearm to prevent further entry.

McEntire asserts our holding would permit an intruder to be convicted of burglary merely by crossing an invisible boundary line and, therefore, "imposes criminal liability where knowledge of the nature of the act is lacking." McEntire did not cross an imaginary boundary line—he was in Beltran's backyard and Beltran testified he made eye contact with her as he tried to open the sliding glass door. Further, although the screen door was open, it was not missing from its track, nor is there any evidence it was obfuscated from view. When police surveyed the home after the burglary, the

screen door was half open and pulled out of its track. From this evidence, it is reasonable to infer McEntire saw the screen door as he reached for the inner sliding glass door, but chose to cross the portal of the doorway anyway.[2] We conclude substantial evidence supports the violent felony enhancement.

4.–9.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The trial court is ordered to prepare an amended abstract of judgment with service to all appropriate agencies to reflect the following modification: the terms imposed on defendants for unlawful possession of ammunition (§ 30305, subd. (a); counts 4 and 5) are stayed. In all other respects, the judgment is affirmed.

Poochigian, Acting P. J., and Franson, J., concurred.

A petition for a rehearing was denied May 16, 2016, and the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied August 10, 2016, S234656.

---

[2] In his reply brief, McEntire argues the prosecutor failed to argue this theory of entry at trial. CALCRIM No. 1700 properly instructed the jury as to when a burglarious entry occurs. Nothing in the record suggests the prosecutor advised the jury entry for purposes of burglary occurred only after McEntire made his way into the inner part of the home.

[*] See footnote, *ante*, page 484.