# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

ISAIAH HENDRIX,
Defendant and Appellant.

S265668

Second Appellate District, Division Six
B298952

Ventura County Superior Court
2017025915, 2018037331

August 22, 2022

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Groban, Jenkins, and Guerrero concurred.

Opinion of the Court by Kruger, J.

Early one October morning, defendant Isaiah Hendrix walked up to a house in Oxnard, knocked on the door, and rang the doorbell. Hearing no response, Hendrix walked around the house to the backyard, opened a screen door, and attempted to open the locked glass door behind it. Then, failing that, Hendrix sat down on a bench and stayed there. Hendrix was sitting on the bench when police arrived. Hendrix told police he was there to visit his cousin, but Hendrix's cousin did not, in fact, live in the house. Hendrix was charged with burglary.

At trial, the court gave the jury a standard mistake of fact instruction, which informed jurors that they should not convict Hendrix if they determined he lacked criminal intent because he mistakenly believed a relevant fact — namely, that the house belonged to his cousin and not to a stranger. But the instruction specified that the mistake in question had to be a reasonable one. All parties now acknowledge this was error: To negate the specific criminal intent required for burglary, a defendant's mistaken belief need not be reasonable, just genuinely held. The question before us is whether the instructional error was prejudicial and thus requires reversal. The Court of Appeal, concluding Hendrix's claim of mistake was not credible in any event, answered no. We reach a different conclusion. The instructional error effectively precluded the jury from giving full consideration to a mistake of fact claim that was supported by substantial evidence, where resolution of the issue was central

1

to the question whether Hendrix possessed the criminal intent necessary for conviction.  Whether that claim is credible is a matter for a jury to decide.  We reverse the judgment of the Court of Appeal and remand for further proceedings.

## I.

## A.

The case before the jury turned on a single question:  what was Isaiah Hendrix doing at the house in Oxnard?

Surveillance video captured Hendrix there around 7:00 a.m.  The video showed Hendrix pacing back and forth in front of the house, then walking up to the front door, where he knocked and pressed the video doorbell.  He then walked around the house and opened a side gate into the yard.  He pushed open the backyard screen door, then attempted to open the glass sliding door behind it.

Artrose Tuano, who lived in the house, was home at the time.  Tuano testified that he had never seen Hendrix before; that the screen door into the house was locked; and that he called the police when Hendrix tried to "jimmy" it open.  When police arrived, they found Hendrix sitting on a bench in the backyard.  Officer Christian Aldrete of the Oxnard Police Department testified that when he confronted Hendrix in the backyard, Hendrix was sitting calmly and looked "surprised" to see him.  Officer Randi Vines testified that a search of Hendrix revealed no burglary tools; Hendrix was carrying only a water bottle.

Hendrix immediately offered an explanation for his presence at the Oxnard house:  He claimed to be looking for his cousin Trevor at the house, and asserted that a friend told him Trevor had moved there.  Trevor did not, in fact, live at the

address.  Officer Vines, who, as a matter of chance, knew cousin Trevor from high school, testified at trial that Trevor lived several blocks away.  Hendrix was arrested and charged with first degree burglary.  (Pen. Code, §§ 459, 460.)[1]

At trial, the prosecution introduced evidence to cast doubt on Hendrix's explanation for his presence at the Oxnard house. It played a recording of a call from Ventura County Jail in which Hendrix asked his mother to come up with somebody who could testify they had given him the wrong address.  She responded: "Oh.  No.  You need to do — one of your friends [to] do that crap. I ain't getting nobody caught up or doing any type of drama or lying."  The conversation moved on from there.  On another recorded call, Hendrix's uncle stated that Hendrix had been doing some "crazy shit," including "breaking in people's houses," and asked "what were you doing?"  Hendrix responded by muttering "I don't know," then laughing and chiding his uncle for "talking smack."  Nicole Rodriguez, a supervisor at the Oxnard Costco, testified that Hendrix had previously stolen from the store by deploying an excuse that he was looking for a relative.  Hendrix, she explained, had appeared at the Costco

---

[1]     First degree burglary is defined as entry into an inhabited dwelling with the intent to commit a felony.  (Pen. Code, §§ 459, 460.)  " '[A] burglary is complete upon the slightest partial entry of any kind, with the requisite intent.' "  (*People v. Valencia* (2002) 28 Cal.4th 1, 8, disapproved on other grounds by *People v. Yarbrough* (2012) 54 Cal.4th 889, 894.)  In this case Hendrix concedes he committed an entry — albeit a very slight one — when he briefly extended his hand past the open screen door; he notes that *People v. McEntire* (2016) 247 Cal.App.4th 484, 491– 493, found the entry requirement satisfied based on a similar breach of screen-door space.  Hendrix's arguments instead focus on whether he committed the entry with the requisite criminal intent.

without a membership card, claiming to be looking for his mother. Rodriguez agreed to accompany Hendrix while he searched for her. But upon arriving at the alcohol section, Hendrix grabbed a bottle of tequila and left the store without paying.

The defense rested without presenting witnesses or evidence. In closing, the defense's central argument to the jury was that Hendrix had made a crucial mistake of fact about who lived at the house, which explained why, after knocking on the front door and trying to open the back door, Hendrix simply sat down in the backyard and waited for Trevor to arrive. The prosecution disputed there had been any mistake.

**B.**

Before it retired to deliberate, the jury was instructed on the elements of burglary according to CALCRIM No. 1700: "The defendant is charged with burglary. To prove the defendant is guilty of this crime, the People must prove that: One, the defendant entered a structure; and two, when the defendant entered a structure he intended to commit theft. To decide whether the defendant intended to commit theft, please refer to the separate instructions I give you on the crime."[2]

To guide the jury's consideration of the intent element, the defense requested CALCRIM No. 3406, concerning mistake of

---

[2] The trial court instructed on theft with CALCRIM No. 1800 that "[t]o prove the defendant is guilty of this crime, the People must prove that the defendant was in possession of property of someone else," that "[h]e took the property without the owner's consent," and that "he took the property and he moved the property even a small distance and kept it for any period of time, however brief."

fact. That instruction provides that the defendant is not guilty of the charged crime if he lacked the mental state required to commit the crime because of a mistaken belief or lack of knowledge. As the bench notes indicate, the instruction can be given in two ways, depending on whether the crime is one of general intent — in which case the defendant's belief must be both actual and reasonable — or specific intent, in which case the defendant need hold only an actual but mistaken belief in the relevant fact. (Judicial Council of Cal., Crim. Jury Instns. (2021) Bench Notes to CALCRIM No. 3406; see generally, e.g., *People v. Lawson* (2013) 215 Cal.App.4th 108, 115 (*Lawson*).) Although the prosecutor here did not object to the defense's request to give the mistake of fact instruction, he asked that the court give the version of the instruction applicable to general intent crimes, which requires proof of an actual *and* reasonable mistaken belief. The court agreed to do so. The jury was thus instructed on mistake of fact as follows:

"The defendant is not guilty of burglary if he did not have the intent or mental state required to commit the crime because he *reasonably* did not know a fact or *reasonably and* mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as he *reasonably* believed them to be, he did not commit burglary. [¶] If you find the defendant believed that the defendant's cousin Trevor resided at the home *and if you find that belief was reasonable*, the defendant did not have a specific intent or mental state required for burglary. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for burglary, you must find him not guilty of that crime." (Italics added.)

As the parties now agree, the inclusion of the italicized language was error.[3]  Burglary is a specific intent crime. (*People v. Thompson* (1980) 27 Cal.3d 303, 313.)  It requires not only that a defendant enter a structure, but that he do so with a particular objective in mind:  larceny (or any other felony).  (Pen. Code, § 459; *People v. Wallace* (2008) 44 Cal.4th 1032, 1077; see *People v. Hood* (1969) 1 Cal.3d 444, 457 [specific intent refers to "defendant's intent to do some further act or achieve some additional consequence" besides commission of a proscribed act].)  As the criminal jury instructions themselves make clear, an unreasonable but honest mistaken belief in a fact can negate the required showing of intent.  (Judicial Council of Cal., Crim. Jury Instns., *supra*, Bench Notes to CALCRIM No. 3406.)

Following a series of otherwise unremarkable instructions, the case went to the jury.  It found Hendrix guilty of first degree burglary and the court sentenced him to a term of 10 years.

On appeal, the People conceded the mistake of fact instruction was erroneous but argued the error was harmless.  A divided Court of Appeal agreed.  Applying the harmless error standard for state law error set out in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), the majority concluded there was "no reasonable probability [Hendrix] would have obtained a more favorable result" in the absence of the instructional error. (*People v. Hendrix* (2020) 55 Cal.App.5th 1092, 1097 (*Hendrix*).)

---

[3]    The defense did not object to the prosecutor's request to use the general-intent version of the instruction.  The Attorney General does not, however, dispute that Hendrix's challenge to the instruction is cognizable on appeal.  (See, e.g., *People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012 (*Hudson*).)

The court took the view that Hendrix's purported belief that he was at Trevor's house was a "fabrication" that "did not make sense to the jury" and "does not cohere on appeal either." (*Id.* at pp. 1098, 1097.)

In dissent, Justice Tangeman viewed the erroneous mistake of fact instruction as tantamount to "misinstruction on an element of the offense." (*Hendrix, supra,* 55 Cal.App.5th at p. 1100 (dis. opn. of Tangeman, J.).) Justice Tangeman would consequently have applied a more demanding standard of harmless error review — the federal "beyond a reasonable doubt" standard set out in *Chapman v. California* (1967) 386 U.S. 18, applicable to errors under the federal Constitution. Applying that standard, Justice Tangeman would have reversed.

We granted review, limited to two questions: (1) What standard of prejudice applies to the trial court's error in instructing on mistake of fact, and (2) whether the Court of Appeal erred in holding the error harmless.

## II.

The type of mistake of fact claim Hendrix raised in this case is often described as a "defense" to the charge. (See, e.g., *People v. Hanna* (2013) 218 Cal.App.4th 455, 462.) But the term is somewhat misleading, because mistake of fact is, generally speaking, "not a true affirmative defense." (*Lawson, supra,* 215 Cal.App.4th at p. 118.)[4] It is, rather, an assertion by the

_____

4      There is a recognized exception for certain public welfare offenses where the prosecution is not required to prove knowledge or intent of a particular fact, such as the age of a would-be purchaser of alcohol, but where we nonetheless allow

defendant that a particular factual error in his perception of the world led him to lack the mens rea required for the crime. (See Pen. Code, § 26, paragraph [3] [persons are not capable of committing crimes if they "committed the act . . . under an ignorance or mistake of fact, which disproves any criminal intent"]; *Lawson*, at p. 111 ["The mistake-of-fact defense operates to negate the requisite criminal intent or mens rea element of the crime"]; *People v. Anderson* (2011) 51 Cal.4th 989, 996–998 [same conclusion with respect to similar "defense" of accident]; see also, e.g., *State v. Sexton* (N.J. 1999) 733 A.2d 1125, 1128–1130 [discussing the relationship between mistake of fact and mens rea].)

Say a defendant is charged for theft of a box of oranges. (*People v. Photo* (1941) 45 Cal.App.2d 345, 346.) He claims he mistakenly thought the oranges were his. If the defendant indeed believed the oranges were his, it is necessarily true that he did not intend to steal them from someone else. His mistake of fact claim, then, is simply one particular way of saying he lacked the mens rea required for theft. (*Id.* at p. 353.) In this way mistake of fact operates as a kind of failure-of-proof defense, reflecting a defendant's attempt to suggest the prosecution failed in its burden to establish beyond a reasonable doubt that the defendant acted with the criminal intent required for the offense. (1 Wharton's Criminal Law (16th ed. 2021) Mistake of Fact, § 13.2, pp. 384–387.) " 'If the defendant's ignorance or mistake makes proof of a required culpability element impossible, the prosecution will necessarily fail in its proof of the offense.' " (*State v. Sexton, supra*, 733 A.2d at pp. 1128–1129,

---

the defendant to raise mistake as an affirmative defense. (See *In re Jennings* (2004) 34 Cal.4th 254, 280–281.)

quoting Robinson & Grall, *Element Analysis in Defining Criminal Liability: The Model Penal Code and Beyond* (1983) 35 Stan. L.Rev. 681, 726–727.)

In this case, Hendrix's mistake of fact claim was raised in connection with the question whether he intended to commit theft once inside the Oxnard house. Whether the jury credited the claim would determine whether he possessed the requisite criminal intent: that is, whether he was innocently intending to look for his cousin Trevor or culpably intending to carry out a burglary.[5] The prosecutor's theory of Hendrix's intent was captured in the positive phrasing of the substantive mens rea instruction: Hendrix intended to burglarize the home. Hendrix's theory of intent was captured in the negative phrasing of the mistake of fact instruction: He intended to visit Trevor, not carry out a burglary. Because they ultimately help the jury answer the same question — Hendrix's state of mind at the time he entered the home — the two instructions should have been aligned: The jury was instructed, if not in so many words, that burglary is a specific intent crime, so it should have received a specific intent mistake of fact instruction that

---

[5] There is one explanation of Hendrix's actions that would break this mirror-image connection between mistake of fact and mens rea: if Hendrix indeed believed that the house was Trevor's, but intended to burglarize his own cousin's house. The People argue that, by not acknowledging this possibility, the mistake of fact instruction was misleading in a way that actually favored Hendrix, rather than the People. As a theoretical matter, the People might have a point. But the theoretical possibility that Hendrix intended to burglarize his cousin Trevor was raised and rejected at trial: The parties briefly wrangled over the burglarizing-Trevor's-house theory while crafting the jury instructions, but the judge dismissed the idea as "a little bit far fetched" and that theory was never presented to the jury.

recognized the possibility that a genuine, if unreasonable, belief would negate a finding of criminal intent. (*People v. Givan* (2015) 233 Cal.App.4th 335, 350; *Lawson, supra,* 215 Cal.App.4th at p. 115.) The jury instead received a more limited mistake of fact instruction geared toward general intent crimes, generating the problem in this case.

## III.

It is undisputed that the trial court's instruction on mistake of fact was erroneous. But not every error at trial requires reversal; the law requires us to affirm a jury verdict despite instructional error if the error was harmless. Indeed, in California, harmless-error review is a matter of constitutional mandate: "The California Constitution imposes upon this court an obligation to conduct 'an examination of the entire cause' and reverse a judgment below for error only upon determining that a 'miscarriage of justice' has occurred." (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 178, quoting Cal. Const., art. VI, § 13.) As the high court has explained, the harmless-error doctrine "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, [citation], and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681, citing R. Traynor, The Riddle of Harmless Error (1970) p. 50.)

The central question before us is whether the instructional error at issue was prejudicial and thus requires reversal of the resulting conviction. We conclude it was.

## A.

At the outset, we address the threshold question of the standard for evaluating prejudice. The "generally applicable California test for harmless error" is set forth in *Watson, supra*, 46 Cal.2d 818. (*People v. Breverman* (1998) 19 Cal.4th 142, 176.) Under the *Watson* test, we deem an error harmless unless it is "reasonably probable" the outcome would have been different in the absence of the error. (*Watson*, at p. 836.) As a general matter, this test applies to " ' "incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error." ' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

"In contrast, we evaluate the harmlessness of violations of the federal Constitution under the standard set forth in *Chapman v. California*[, *supra*,] 386 U.S. 18." (*People v. Gonzalez, supra*, 5 Cal.5th at p. 195.) This "stricter" standard of review requires reversal unless the error is "harmless beyond a reasonable doubt." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1160.) Among the constitutional errors subject to *Chapman* review is misinstruction of the jury on one or more elements of the offense. (*People v. Wilkins* (2013) 56 Cal.4th 333, 351 (*Wilkins*); *Hudson, supra*, 38 Cal.4th at p. 1013.) This is because the federal Constitution requires "criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." (*United States v. Gaudin* (1995) 515 U.S. 506, 510; accord, *Victor v. Nebraska* (1994) 511 U.S. 1, 5; *Sullivan v. Louisiana* (1993) 508 U.S. 275, 277–278.) A jury misinstruction that relieves the prosecution of its burden to prove an element of the crime — by either misdescribing the element or omitting it entirely — violates this requirement.

(See *Neder v. United States* (1999) 527 U.S. 1, 10 ["In both cases — misdescriptions and omissions — the erroneous instruction precludes the jury from making a finding on the *actual* element of the offense"].)

Here, the Attorney General defends the Court of Appeal's decision to apply the ordinary *Watson* test for state law error. Hendrix, by contrast, urges us to adopt the view of Justice Tangeman's dissent below: that the trial court's misinstruction on mistake of fact was tantamount to a misinstruction on the mental, or mens rea, element of the offense, requiring the application of *Chapman* review. (*Hendrix, supra*, 55 Cal.App.5th at p. 1100 (dis. opn. of Tangeman, J.).)

We recently considered a similar issue in *People v. Molano* (2019) 7 Cal.5th 620, 670, in which we addressed a criminal defendant's claim that a trial judge erroneously failed to modify a reasonable-mistake-of-fact instruction on rape in a manner that would have informed the jury that an *unreasonable* belief in the victim's consent, if genuinely held, would *also* negate the specific intent to commit rape. After first finding the claim of error forfeited, and only assuming without deciding the validity of the theory, we concluded any error in failing to instruct on an unreasonable-mistake defense was harmless. We treated the error as one of state law, citing Court of Appeal precedent for the proposition that " '[e]rror in failing to instruct on the mistake-of-fact defense is subject to the harmless error test set forth in *People v. Watson*.' " (*Molano*, at p. 670.)

*Molano* cited several Court of Appeal cases, including *People v. Givan, supra*, 233 Cal.App.4th 335, which involved a mistake of fact claim based on the defendant's voluntary intoxication (*id.* at pp. 339, 347–349). Voluntary intoxication,

like mistake of fact, is an issue that "bears on the question of whether the defendant actually had the requisite specific mental state." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) We have reviewed instructional errors regarding a defense of voluntary intoxication under *Watson*. (See *People v. Pearson* (2012) 53 Cal.4th 306, 325; *People v. Jackson* (1989) 49 Cal.3d 1170, 1195.)

Hendrix contends that, in order to prove he harbored the requisite criminal intent to steal, the prosecution in his case was required to prove beyond a reasonable doubt that he did not make a mistake about Trevor's residence. (See *People v. Mayberry* (1975) 15 Cal.3d 143, 157; *People v. Frye* (1992) 7 Cal.App.4th 1148, 1159; *People v. Bolden* (1990) 217 Cal.App.3d 1591, 1600–1601; *People v. Howard* (1996) 47 Cal.App.4th 1526, 1533, disapproved on another ground by *People v. Fuhrman* (1997) 16 Cal.4th 930, 947, fn. 11.) The error here, in Hendrix's view, lessened the prosecution's burden of proof on that point.

Hendrix compares the result to the error in the escape rule instruction at issue in *Wilkins*, *supra*, 56 Cal.4th 333, to which we applied *Chapman*, not *Watson*, on review. In that case, the defendant stole a set of kitchen appliances from a home and fled down the 91 freeway in a pickup truck. (*Id.* at p. 338.) Some 62 miles later, a stove fell off the back of the truck and killed another motorist. (*Id.* at pp. 338–339.) Wilkins was convicted of felony murder on the theory that the death of the motorist occurred during the commission of a burglary. (*Id.* at p. 340.) But the trial court erroneously declined to give an instruction on the "escape rule" — the rule that " '[t]he crime of burglary continues until the perpetrator has actually reached a temporary place of safety.' " (*Id.* at p. 341.) The People argued *Watson* applied on review for harmless error (*id.* at p. 348), but

we disagreed and instead evaluated the error under *Chapman*, concluding the error "amounted to misinstruction on an element of the offense." (*Id.* at p. 350.) Hendrix argues the same result ought to obtain here, notwithstanding *Molano*.

The Attorney General disputes Hendrix's characterization of the error, as well as the analogy to the escape rule at issue in *Wilkins*. Ultimately, however, we need not resolve this dispute about the proper characterization of the error for purposes of applying *Chapman* or *Watson*, because the erroneous mistake of fact instruction was prejudicial even under the less stringent standard set out in *Watson*.

## B.

Under *Watson*, a reviewing court must reverse if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.) " ' "We have made clear that a 'probability' in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." ' " (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050, italics omitted.)

The mistake of fact instruction at Hendrix's trial told the jury that Hendrix lacked the requisite mens rea if his mistaken belief that he was visiting Trevor's house was reasonable — implying, of course, the same was not true if his belief was unreasonable. But Hendrix's mistake did not need to be reasonable; it was enough if it was genuinely held. At least as the case was presented to the jury, if Hendrix believed he was visiting Trevor's house, then Hendrix necessarily lacked the mens rea for the crime. The misinstruction at Hendrix's trial effectively operated to impose an unwarranted reasonableness

14

requirement on Hendrix's mistake of fact claim. Nor was that error cured, as the Attorney General urges, by the presence of a correct instruction on burglary. Although the mens rea instruction did correctly tell the jury that the intent to commit theft was required for a conviction, the mistake of fact instruction incorrectly implied that an unreasonable mistake would be insufficient to negate that intent. (See *People v. Speck* (2022) 74 Cal.App.5th 784, 793 [failure to give mistake of fact instruction was not cured by correct instruction on mens rea element of the crime where "intent was the primary issue in dispute"]; see *id.* at pp. 790–795.)

The potential effect of the error was considerable in this case, where Hendrix's mistake of fact claim was the central disputed issue at trial. Competing assessments of Hendrix's mental state occupied the vast majority of closing argument. The prosecutor admitted that the mens rea element was where "the most dispute is going to be in this case," since "there was a significant amount of evidence directed towards this element during the trial." After arguing that the jury should interpret Hendrix's actions on the surveillance video as an attempt to burgle Tuano's home, the prosecutor emphasized facts casting doubt on Hendrix's alternative explanation for his arrival at the house. According to the prosecutor, Hendrix could not possibly have believed Trevor lived at the house. "The cousin's house is in the same general area, a few blocks away, but it's not in a similar relationship to any of the nearby landmarks. It's on the other side of Gonzales Road. It's on the other side of a high school." There was "no evidence that Trevor lives there," even though "that's the story that the defendant supplied." "He's not in the right neighborhood, he's not on the right side of Gonzales Road. There's no evidence of another explanation other than a

theft that fits all the evidence in this case." Rather, "common sense says when someone is trying to get into a house that they think is empty that they have no connection to, that they don't have any reason to be there, then the rational common sense explanation, the thing that everyone knows is that it's to steal." Ultimately, the prosecutor told the jury, "you're presented with this conflict between the direct evidence of the defendant's statement of his intent and all of the circumstantial evidence in the case. And you have to say, okay, what explains everything? What fits with everything?" And the answer was simple: "there's only one reasonable interpretation of all the evidence in this case . . . the defendant is guilty of Count 1, residential burglary." According to the prosecutor, Hendrix's alternative theory — that he had made a mistake of fact and intended to visit his cousin Trevor — was utterly incredible: there was "not any credible evidence of an alternative intent" and "we know" Hendrix's mistake of fact story was "a pack of lies."

The defense argued just the opposite: Hendrix "went [to the house] with the intent to find his cousin, not to break in." Defense counsel added: "From the very beginning, when the officers had their guns drawn he told them, 'I'm here looking for Trevor.'" Defense counsel emphasized that Hendrix had been sitting on the backyard bench for seven minutes before officers arrived. "Is that the act of a burglar or is that the act of someone waiting and trying to find their cousin?" "[W]hen Mr. Hendrix is knocking at the door, is it reasonable that he's looking for his cousin? Yes. How do we know it's reasonable? His cousin lives two blocks away." And the defense repeatedly emphasized its reliance on the mistake of fact theory: "If you find that the defendant believed that his cousin Trevor resided at the home

and if you find that belief is reasonable, you must find him not guilty. You must."

The jurors' attention was thus directed to deciding which narrative was correct: an opportunistic burglary of a stranger, or a social visit to a house Hendrix believed was Trevor's. On this crucial point the erroneous mistake of fact instruction was highly relevant — and also highly likely to mislead the jury. At least one juror could easily have considered Hendrix's purported belief unreasonable — for example, because the Tuano home (as the prosecutor emphasized) was not sufficiently close to Trevor's actual address — and applied the erroneous reasonableness requirement to rule out Hendrix's mistake-of-fact theory from consideration.

Certainly, as the Court of Appeal emphasized, the evidence supporting Hendrix's mistake of fact defense was not overwhelming. (*Hendrix*, *supra*, 55 Cal.App.5th at p. 1097.) And there was evidence pointing in the other direction. The prosecution introduced evidence suggesting that Hendrix did not in fact believe that Trevor lived at the house, including evidence that Hendrix had previously told a similar family-related story when stealing from the Oxnard Costco; that he failed to deny his uncle's statement over the telephone that he had been "breaking in people's houses"; and that his recorded conversation with his mother, in which he asked her to find "somebody" who could be a witness for him at trial and did not respond to her statement that this task could involve her in "drama or lying," indicated that, at a minimum, Hendrix did not recall who had told him Trevor lived at the house — and perhaps that no one had done so, and Hendrix may have been trying to procure someone to lie on his behalf. The prosecution relied extensively on this evidence at closing argument to rebut

Hendrix's contention that he was mistaken about who lived in the house and intended not to steal, but to visit his cousin.

Ultimately, however, the question is not whether the jurors *could* have concluded that Hendrix was intentionally lying — certainly they could — but instead whether the nature of the evidence leaves us " 'in serious doubt as to whether the error affected the result.' " (*People v. Mower* (2002) 28 Cal.4th 457, 484.) And there are reasons for serious doubt in this case, including evidence of conduct difficult to explain as part of an intended burglary: Why, if Hendrix was attempting to break into a stranger's home, did he choose to remain seated in the backyard, where police found him several minutes later? And why, if his intent was to commit burglary, did he have no burglary tools? A jury could reasonably understand the security footage of Hendrix's meandering approach to the house as casing the home in preparation for burglary — but a jury could also see the footage as capturing a bumbling and disjointed attempt to locate Trevor, capped by a frustrated decision to sit down on the backyard bench and wait.

Although the main issue at trial was whether Hendrix genuinely believed that Trevor lived at the house — and not specifically whether Hendrix's belief was reasonable — a juror viewing all the evidence would naturally have considered the possibility that Hendrix was neither intentionally lying nor harboring a reasonable belief, but was instead unreasonably (though honestly) mistaken about where his cousin really lived. Indeed, defense counsel expressly noted the possibility of confusion at closing argument: "[W]hat the D.A. wants you to do is believe that every single act that someone makes always can lead to a logical explanation. And people don't always do things that make sense. Sometimes people are on drugs.

Sometimes people are not on their drugs. And sometimes the things people do don't make sense." A jury considering the evidence in this case would have had considerable reason to believe that Hendrix's actions fell into that last category.

Given the evidence before the jury, there is " ' "more than an abstract possibility" ' " (*Richardson v. Superior Court*, *supra*, 43 Cal.4th at p. 1050, italics omitted) that at least one juror thought Hendrix genuinely believed the house belonged to a relative and that this juror or jurors were influenced by the erroneous mistake of fact instruction to discount that belief as unreasonable under the circumstances.[6] As Hendrix points out, the circumstances surrounding the deliberations are at least consistent with this conclusion. It appears the jury did not find

---

[6] We have not previously decided whether a hung jury, as opposed to an acquittal, is a "more favorable" (*Watson*, *supra*, 46 Cal.2d at p. 836) outcome for purposes of harmless error review under *Watson*. (See *People v. Soojian* (2010) 190 Cal.App.4th 491, 518–521.) But several Court of Appeal cases have answered that question in the affirmative. (See *People v. Doane* (2021) 66 Cal.App.5th 965, 984 ["Here, the question is whether it is reasonably probable that, absent the errors, at least one juror would have voted to acquit Doane of gross vehicular manslaughter"]; *People v. Dryden* (2021) 60 Cal.App.5th 1007, 1025 ["we consider whether it is reasonably probable that one or more jurors would conclude that the prosecution failed to meet its burden of proving beyond a reasonable doubt that defendant did not act in lawful self-defense if this case were tried without the erroneous admission of the prior acts evidence"]; *People v. Zaheer* (2020) 54 Cal.App.5th 326, 341 ["there is a reasonable chance that at least one juror relied on the prospect of a different car to reconcile his or her doubts about the reliability of Martha's testimony"]; cf. *People v. Winkler* (2020) 56 Cal.App.5th 1102, 1171 [finding error harmless because there was no reasonable probability that "even a hung jury would have been achieved"].) We do the same today.

this to be an open-and-shut case, despite the fact that Hendrix's actions at the Oxnard house were recorded on video for the jury's review. The jury reported a deadlock midway through deliberations and requested a transcript or readback of Hendrix's jailhouse phone calls, suggesting a particular concern with what those calls could reveal about Hendrix's intentions at the house.

The Attorney General rightly notes that the jurors were entitled to consider the reasonableness of Hendrix's purported belief as one factor in answering the ultimate question in the case: whether Hendrix intended to steal or actually and in good faith believed that the house he entered belonged to Trevor. It is generally true that a person is less likely to hold an unreasonable belief than a reasonable one, and the jurors were entitled to consider unreasonableness as a factor in this case. (See *People v. Watt* (2014) 229 Cal.App.4th 1215, 1218; *People v. Navarro* (1979) 99 Cal.App.3d Supp. 1, 11.) The jurors were not, however, instructed to consider the reasonableness of Hendrix's belief merely as proof of its genuineness. They were instead instructed that Hendrix should not be found guilty if his belief was *both* reasonable and genuine — leaving the distinct, and incorrect, impression that Hendrix's mistake of fact argument would have no purchase if his mistake was unreasonable.

In concluding otherwise, the Court of Appeal appeared to ask the wrong question, and for that reason arrived at the wrong answer. *Watson* instructs a reviewing court to ask whether there is a reasonable probability the jury might have reached a different result had it been instructed correctly. (*Watson, supra,* 46 Cal.2d at p. 836.) In other words, *Watson* asks the court to imagine what the jury would have done in the counterfactual world in which it received correct instructions. While the court

should undertake that task in light of the " 'entire cause, including the evidence' " (*ibid.*), the reviewing court should focus solely on whether "the error affected the outcome" (*People v. Breverman, supra,* 19 Cal.4th at p. 165), not on whether the court personally believes that outcome was correct. The distinction is vitally important. An appellate court may, of course, consider the strength of the evidence against the defendant in determining whether the absence of a single, discrete error at trial would have made a difference to the trial's overall outcome. (See *id.* at p. 177 [in conducting harmless error analysis, "an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result"].) The court may not, however, rest a harmless error ruling on its own reweighing or reinterpretation of the evidence. These are questions solely for the jury, and a reviewing court must, at bottom, ground its analysis in what the "jury is likely to have done," not how the court believes the jury should have analyzed the evidence before it. (*Ibid.*, italics omitted.)

In finding the instructional error at Hendrix's trial harmless, the Court of Appeal leaned heavily on its own view of the facts, rather than focusing its analysis on the error's likely effect on the jury's consideration of those facts. The majority opined that "the story [Hendrix] told the police was a fabrication." (*Hendrix, supra*, 55 Cal.App.5th at p. 1098.) In reaching that conclusion, the majority stepped into the role of the jury, weighing competing evidence before coming to its own conclusions about disputed facts in the case. The majority correctly recognized, for example, that "[t]here is no evidence of

what [Hendrix] was thinking while sitting in the backyard"; remarked that Hendrix "obviously" has "some mental impairment" that could have affected his state of mind; and observed that while sitting in the backyard, Hendrix could have been either "pondering on the whereabouts of cousin Trevor" or "pondering on his next attempted point of entry." (*Id.* at p. 1098, fn. 3.) These were all, of course, central questions for the jury — questions the majority proceeded to answer itself. "[W]e do not believe," the majority concluded on this point, "that a friend told him that cousin Trevor had moved to the victim's house. It seems much more likely, consistent with the prosecutor's theory, that appellant made up this excuse to avoid arrest." (*Ibid.*)

The majority also appears to have offered its own interpretation of the security footage — concluding that Hendrix's conduct in approaching the house constituted the "method of operation for a residential burglar," opining that the evidence revealed "multiple forcible attempts to enter the house and a garage," and asking: "Would a person who subjectively believes that a cousin lives at a residence also think that the cousin would allow forcible entry for a social visit?" (*Hendrix*, *supra*, 55 Cal.App.5th at p. 1098.) The court then "emphasized that [Hendrix] did not testify that he subjectively believed cousin Trevor lived at the scene of the burglary." (*Ibid.*) (In point of fact, Hendrix did not testify at all, as was his Fifth Amendment right.) And the court came to a firm conclusion about the meaning of Hendrix's mumbled "I don't know" response to his uncle on the jailhouse recording: "This is not the comment of a person who subjectively believed that cousin Trevor lived in the house." (*Hendrix*, at p. 1098.)

The Court of Appeal's analysis amounted, in sum, to a determination that Hendrix's story was false because it was

unreasonable, convenient, and because the limited evidence supporting it was outweighed by other evidence. But the law recognizes unreasonable mistakes as negating the specific intent required for burglary; a defendant's factual claim is not false merely because it helps his case; and although the proof of Hendrix's belief may have been limited, it was nonetheless sufficiently substantial to raise a genuinely contested issue. The overall effect of the Court of Appeal's approach was to substitute the court's judgment for that of Hendrix's jury regarding the central question in the case: what Hendrix really believed when he approached the Oxnard house. It may well be that a properly instructed jury would have agreed with the Court of Appeal's assessment of the evidence. But it was the jury's assessment, not the Court of Appeal's, to make.

In sum, there is " ' "a reasonable chance, more than an abstract possibility" ' " that Hendrix's jury would have come to a different verdict had it been correctly told that it should not find Hendrix guilty if it believed Hendrix made an honest, but unreasonable, mistake. (*Richardson v. Superior Court, supra*, 43 Cal.4th at p. 1050, italics omitted.) The law recognizes even an unreasonable mistake as grounds for acquittal under the circumstances. And there was substantial evidence — not overwhelming evidence, but realistic evidence — to support the conclusion that Hendrix made an unreasonable mistake. Because there is at least a reasonable probability a jury making that assessment would have given a different answer had it received correct instructions in this case, we conclude the instructional error was prejudicial and requires reversal. The Court of Appeal erred in concluding otherwise.

## IV.

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**
**GUERRERO, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Hendrix

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 55 Cal.App.5th 1092
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S265668
**Date Filed:**  August 22, 2022

_____

**Court:**  Superior
**County:**  Ventura
**Judge:**  Paul W. Baelly

_____

**Counsel:**

Adrian Dresel-Velasquez, under appointment by the Supreme Court, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen, Idan Ivri and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Adrian Dresel-Velasquez
P.O. Box 3443
Santa Barbara, CA 93130
(916) 215-3519

John Yang
Deputy Attorney General
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6105