Filed 8/26/24  P. v. Bell CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062580 |
| v. | (Super. Ct. No. 19NF2211) |
| ANGELA THERESA BELL, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Elizabeth G. Macias, Judge. Affirmed.

Belinda Escobosa, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Anne Spitzberg, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Angela Theresa Bell of grand theft by embezzlement after she stole large sums of money from the Central Buena Park National Little League (the league), where her children played baseball and she served as treasurer. Bell moved the trial court to reduce her conviction to a misdemeanor under Penal Code section 17, subdivision (b) (section 17(b)).[1] The court denied her motion, relying in part on the large amount of loss she had caused the league (about $13,000) and its finding that her offense involved planning. It sentenced her to two years of formal probation, with various terms and conditions.

Bell challenges the trial court's denial of her section 17(b) motion, contending the evidence did not support the court's findings regarding the amount of the league's loss and her planning of the crime. She also challenges probation conditions requiring her to submit to a chemical breath test on demand and to participate in alcohol treatment if recommended by her probation officer.[2]

As discussed below, we conclude the record supported the trial court's findings for purposes of Bell's section 17(b) motion. And we conclude

---

[1] As explained below, grand theft by embezzlement is a "'wobbler'"—a crime that "'in the trial court's discretion, may be sentenced as either a felony or a misdemeanor.'" (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 758.)

[2] Bell also challenges the imposition of a condition prohibiting her from consuming alcohol or being present at an establishment that sells primarily alcoholic beverages. Although the trial court's minute order includes this condition, the court did not impose it in its oral pronouncement of judgment. "Where there is a discrepancy between the oral pronouncement of judgment and the minute order . . . the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) We order the clerk of the trial court to delete this condition from the minute order and do not address it further.

that Bell forfeited her challenges to the probation conditions. We therefore affirm the judgment.

FACTS

I.

THE INFORMATION

In January 2022, the prosecution charged Bell with grand theft by embezzlement (Pen. Code, §§ 487, subd. (a), 508). She pleaded not guilty, and the matter proceeded to trial.

II.

THE EVIDENCE AT TRIAL

*A. The Prosecution's Case*

Bell was the mother of two boys who played baseball in the league, one of eight leagues in California Little League Baseball, District 29. The league was run by a small, all-volunteer board of directors. Bell joined the board and, beginning in February 2017, served as the league's treasurer.

As treasurer, Bell was responsible for the league's finances and reported on them to the board at monthly meetings. She was responsible for paying the league's expenses and was in charge of the league's bank account. Her name was on the account and she had a debit card and a checkbook for it. Bell was given all the money from registrations, snack bar sales, and other sources of income for the league. She was not authorized to make personal purchases using league funds or to withdraw cash from the league's account.

At some point during Bell's tenure as treasurer, other board members became suspicious of her. She would report that the league's account was "in the green" but would not provide bank statements, and the board "just couldn't get an answer" on the bank balance. After board

members learned that Bell had not paid certain league obligations, they spoke with Shirley Glenn, who was then the assistant district administrator for District 29. Glenn advised them to go to the bank to "see what was going on." On September 1, 2018, board members went to the bank and discovered that the bank had closed the league's account three days before, after it reached a negative balance of about $990.

Board members confronted Bell at her home and retrieved $534 in cash, $655 in checks, the league's checkbook and debit card, bank statements and other records, and five receipt books. The receipt books included copies of the league's receipts—one book covered the period from January to September 2017 and the other four included receipts from October 2017 or later. The receipts primarily reflected the league's income but also recorded some expenses. The bank statements showed that Bell had been using the league's debit card to withdraw cash and to make personal purchases. They also showed that the league's bank account had a negative balance for three different months during Bell's tenure, before August 2018, when the bank closed the account. Bell also provided the board members with receipts for purchases she had made.

Board members asked the district to conduct an audit of the league's finances. Glenn, who had a background in loss prevention and auditing, conducted the audit. She testified about the results of her investigation at trial.

Glenn reviewed the league's financial records, including the receipt books retrieved from Bell. Glenn testified at trial that there were four receipt books. She concluded that Bell had caused the league a loss of about $13,400 between October 1, 2017, and August 29, 2018. She reached this

number by first comparing the receipt books to deposits reflected in the bank statements. She determined based on the receipt books that during the relevant period, the league had about $38,000 in income. And she calculated based on the bank statements that the league had only about $27,000 in deposits during that period, leaving about $11,000 unaccounted for.

Glenn reduced that amount by accounting for cash the league had on hand (about $140), money that board members had retrieved from Bell ($1,105.86), amounts given out as raffle prizes ($1,000), and receipts reflecting Bell's cash purchases for league purposes (about $540).[3] Glenn then added about $1,000 to the amount of missing funds for personal purchases Bell had made using league money, based on bank statements and cash receipts. She testified about several unauthorized debit card purchases: gas purchases and purchases at Walmart, Vans, and 7-Eleven, amounting to about $300. Glenn added about $2,700 to the missing funds for Bell's unauthorized cash withdrawals. Finally, Glenn added about $1,500 in bank fees she attributed to Bell's conduct, resulting in the total loss of about $13,400. A table containing a summary of Glenn's accounting was admitted into evidence, along with the bank statements and the receipt books.

On cross-examination, Glenn acknowledged that for most months, the receipt books' stated amounts for snack bar ATM card sales did not exactly match the amounts automatically deposited in the league's bank account. She explained that "the box checked for . . . ATM versus . . . cash could be switched."

---

[3] Glenn noted there were two check deposits for which there was no receipt and said she had adjusted the missing amount to account for them. A summary of her calculation did not reflect any adjustment for these items.

*B. The Defense's Case*

Bell testified in her own defense and denied embezzling money from the league. We do not recount her testimony in detail. In essence, Bell testified that she had been unqualified for the role of treasurer and did not know what she was doing. Various aspects of her testimony suggested that other board members might have stolen the money from the league.

*C. The Verdict and Sentencing*

The jury found Bell guilty as charged. Bell filed a sentencing brief in which she asked the trial court to reduce her conviction to a misdemeanor under section 17(b). At the sentencing hearing, the court denied Bell's motion. In doing so, the court considered the sentencing factors listed in California Rules of Court, rules 4.414 (criteria affecting probation), 4.421 (circumstances in aggravation), and 4.423 (circumstances in mitigation).[4] Among other things, the court determined: the league was a vulnerable victim (rules 4.414(a)(3), 4.421(a)(3)), Bell had taken advantage of a position of trust (rules 4.414(a)(9), 4.421(a)(11)), and the circumstances of the crime involved planning (rules 4.414(a)(8), 4.421(a)(8)).[5]

The trial court also considered the amount of the league's loss, under both rule 4.414(a)(5) and rule 4.421(a)(9). In discussing rule 4.414(a)(5)—the degree of monetary loss to the victim—the court noted there

[4] All further references to rules are to the California Rules of Court.

[5] Rule 4.414(a)(8) addresses "criminal sophistication or professionalism," and rule 4.421(a)(8) addresses "planning, sophistication, or professionalism." The trial court found planning relevant to both, and Bell does not contend this was error. The court concluded the circumstances of the offense did not indicate sophistication.

was a dispute regarding the amount but said, "[T]he evidence before the [c]ourt is that the [$]13,000-plus is the accurate amount." As for rule 4.421(a)(9)—whether the crime involved a taking or damage of great monetary value—the court stated: "I note that [Bell's counsel] indicates that the amount is less. The [c]ourt notes that in order for an offense to amount to a felony, the loss should be $950 or more. In this case we are well above that amount. The [c]ourt does believe that this factor applies."

The trial court sentenced Bell to two years of formal probation and imposed numerous conditions, including a requirement that Bell submit to a chemical breath test on demand and participate in alcohol treatment if recommended by the probation officer. Bell timely appealed.

## DISCUSSION

Bell claims the trial court abused its discretion by (1) denying her motion under section 17(b) to reduce her conviction to a misdemeanor and (2) imposing certain probation conditions pertaining to alcohol. We find no abuse of discretion in the court's denial of Bell's motion, and we conclude Bell forfeited her challenges to the probation conditions.

## I.

### MOTION UNDER SECTION 17(b)

Bell challenges the trial court's denial of her motion under section 17(b). She claims the court's ruling relied in part on two determinations not supported by the record: (1) that the total loss to the league was around $13,000; and (2) that her crime involved planning.[6] As explained below, we conclude the evidence supported the court's findings.

---

[6] Bell erroneously claims the trial court also found that her crime involved sophistication. As noted, the court found that the circumstances did not indicate sophistication.

7

*A. Governing Law*

Grand theft by embezzlement of more than $950 is a wobbler—a crime that in the trial court's discretion, may be sentenced as either a felony or a misdemeanor. (*People v. Selivanov, supra*, 5 Cal.App.5th at p. 758.) "The trial court has the sole discretion, under section 17(b), to treat a wobbler as a felony or a misdemeanor for sentencing purposes. [Citation.] 'By its terms, [section 17(b)] sets a broad generic standard.' [Citation.] '[S]ince all discretionary authority is contextual, those factors that direct similar sentencing decisions are relevant, including 'the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or his traits of character as evidenced by his behavior and demeanor at the trial.' [Citations.]" (*People v. Lee* (2017) 16 Cal.App.5th 861, 866.) "As a general matter, the court's exercise of discretion under section 17(b) contemplates the imposition of misdemeanor punishment for a wobbler 'in those cases in which the rehabilitation of the convicted defendant either does not require, or would be adversely affected by, [felony punishment].' [Citation.]" (*People v. Park* (2013) 56 Cal.4th 782, 790.)

A reduction under section 17(b) is an act of leniency, not entitlement. (*People v. Tran* (2015) 242 Cal.App.4th 877, 892.) "We review the trial court's ruling on a motion to reduce a felony to a misdemeanor pursuant to . . . section 17[(b)] for an abuse of discretion and give deference to the trial court's weighing of the relevant factors." (*People v. Mullins* (2018) 19 Cal.App.5th 594, 611.) We review the court's underlying factual

determinations for substantial evidence.[7] (*People v. Buford* (2016) 4 Cal.App.5th 886, 901.)

*B. Analysis*

The record supports the trial court's determination that Bell had caused the league a loss of about $13,000 and that her crime involved planning.[8] Beginning with the amount of the loss, Glenn testified extensively about her audit of the league's finances and explained how she arrived at the relevant amount. And the league's receipt books and bank statements, on which she relied, were admitted into evidence.

Bell takes issue with several aspects of Glenn's calculations, contending her calculations are suspect. First, Bell contends Glenn's calculation of the league's income was flawed because the total amount in the league's receipt books was about $47,000, contrary to Glenn's calculation of about $38,000. This contention is unhelpful to Bell, as it suggests Glenn understated the league's income, meaning that the sum Bell had embezzled

---

[7] Bell does not contend the trial court was limited to facts found by the jury in exercising its discretion, and we do not consider the issue.

[8] The Attorney General claims that in declining to reduce Bell's conviction to a misdemeanor, the trial court did not rely on an amount of about $13,000, but instead was satisfied that the amount was large and substantially above $950. But as noted, in considering the amount of loss by the league for purposes of rule 4.414(a)(5), the court commented that the amount was disputed but said the evidence showed that the accurate amount was about $13,000.

was even greater.[9] Bell states it is "unclear" if Glenn recognized that some of the league's receipts documented expenses, rather than income. But there is nothing to suggest Glenn failed to appreciate this fact, especially given that her calculation of the league's income was lower than the number Bell provides on appeal.

Second, Bell contends the accounting on some of the league's receipts was inaccurate, noting that the receipt books' stated amounts for snack bar ATM card sales often did not exactly match the amount automatically deposited in the league's bank account. She points to two examples—one in which card purchases were understated by $65 and another in which they were overstated by about $58. Glenn testified these discrepancies could have resulted from erroneously checking the box indicating a card purchase on some receipts. But in any case, Bell does not show that these minor inconsistencies, which went in both directions, meaningfully affected the calculation of the league's income.

Third, Bell asserts that Glenn's calculation of the league's bank deposits (about $27,000) is "curious" because the bank statements show that deposits from June 2017 to the closing of the account in August 2018 totaled about $38,000. Relatedly, Bell notes that while she returned five receipt books, Glenn said there were only four. These contentions are meritless. Glenn calculated the league's missing funds for the period beginning October 1, 2017. She did not consider the league's income before that time, reflected

---

[9] Based on our own calculation, the receipt books for October 2017 forward reflect an income of about $40,000. Given Glenn's familiarity with general little league operations, her calculation may well have been more accurate, as she may have excluded various items that, based on her knowledge, do not represent income to the league.

in one of the receipt books, which explains why she reported reviewing four books. And thus, she properly excluded the league's deposits before that time as well.

Fourth, Bell complains that Glenn failed to adjust her calculation of missing funds based on (1) two deposited checks for which there were no receipts and (2) funds Bell returned after her embezzlement was revealed. These contentions, too, are meritless. Glenn's failure to adjust for the deposited checks meant that they increased the amount deposited without also increasing the league's income under her calculation. As with Bell's contentions regarding Glenn's calculation of the league's income, any faulty calculation here served only to reduce the estimated amount Bell had stolen. As for the funds Bell returned, Glenn accounted for them in her calculation, reducing the missing amount by $1,105.86. Bell claims she returned $1,189, but we need not decide the issue because even if true, the difference between this amount and the amount Glenn credited her with is insubstantial and could not have affected the trial court's ruling. (*People v. Hendrix* (2022) 13 Cal.5th 933, 941 [no reversal without showing of reasonable probability that outcome would have been different absent error].)

Fifth, Bell states it is unclear how Glenn calculated the amount she had stolen through unauthorized ATM cash withdrawals because, although Glenn found about $2,700 in unauthorized withdrawals, "bank statements show a total of $3,590.50 . . . in ATM withdrawals." Once again, this contention is unhelpful to Bell because it suggests that Glenn understated the amount Bell had stolen.

Sixth, Bell claims the record did not support Glenn's determination that her unauthorized purchases using the league's debit card

11

amounted to about $1,000. She notes that the unauthorized debit card purchases Glenn discussed in her testimony—gas purchases and purchases at Walmart, Vans, and 7-Eleven—amounted to only about $300. But Glenn's testimony did not provide an exhaustive itemization of all unauthorized purchases—it merely illustrated the kinds of unauthorized purchases Bell had made. Indeed, Glenn accounted for unauthorized cash purchases, in addition to those Bell had made using the league's debit card.

Moreover, even assuming the trial court could not have relied on the higher amount Glenn testified to, Bell cannot show that the difference—about $700, or about 6 percent of the loss Glenn attributed to Bell's conduct—prejudiced her. We see no reasonable probability that the court would have rendered a more favorable ruling to Bell if it had determined that the amount of the loss was several hundreds of dollars less than the roughly $13,400 Glenn had testified to.[10] The court's reference to the loss of "[$]13,000-plus" suggests it was not relying on the precise amount in reaching its decision.

Finally, Bell claims the trial court should not have considered the $1,500 in bank fees resulting from Bell's criminal conduct as part of the amount she had embezzled. But that is not what the court did. The sentencing factors the court considered focused on "[t]he degree of monetary loss to the victim" (rule 4.414(a)(5)), and on whether the crime involved "an attempted or actual taking *or damage* of great monetary value" (rule 4.421(a)(9), italics added). The court properly considered the banks fees as part of the league's loss.

---

[10] This is true even considering the roughly $84 difference between the amount Bell claims to have returned and the amount Glenn credited her.

Turning to the question of planning, substantial evidence supported the trial court's determination that Bell had engaged in planning in committing the offense. Bell stole large amounts of money from the league during a period of almost a year, through different methods, while taking measures to avoid detection. During monthly board meetings, she refrained from providing bank account statements and avoided giving clear answers regarding the league's bank account balance. She told board members that the league's bank account was "in the green," even though the account sometimes had a negative balance because of her actions. These efforts supported a finding that Bell's crime involved planning. (*People v. Gomez* (2018) 30 Cal.App.5th 493, 500 [defendant's actions to avoid detection indicated planning].) Accordingly, we find no error in the court's denial of Bell's section 17(b) motion.

II.

PROBATION CONDITIONS

Bell challenges the trial court's imposition of probation conditions that subjected her to breath testing on demand and required participation in treatment programs if recommended by the probation officer. We conclude Bell forfeited her challenges to these conditions by withdrawing her objections below.

A. *Background*

Following Bell's conviction, the probation office recommended that the trial court sentence her to probation, with numerous terms and conditions. The recommended conditions included: "[s]ubmit to a chemical test of blood, breath, or urine on the demand of any peace or probation officer" (condition 9); and "[c]ooperate with the probation officer in any plan

13

for psychiatric, psychological, alcohol and/or drug treatment, or counseling . . . ." (condition 10).

In her sentencing brief, Bell objected to condition 9, arguing it would be improper because her offense did not involve alcohol or drugs. At the sentencing hearing, Bell's counsel repeated Bell's objection to this condition. The trial court suggested this condition was similar to permissible search and seizure conditions and would allow officers to require testing should Bell be suspected of driving under the influence. Counsel reiterated that the condition was unrelated to the offense and added that it was more intrusive than a normal search and seizure condition, which would not authorize police to draw blood. During additional colloquy with counsel, the court agreed that as recommended, condition 9 was intrusive because it compelled blood or urine tests. It stated: "I think that I'm going to modify the term so that it only reads 'breath.'" Bell's counsel replied: "Okay. That's fine. Thank you, Your Honor."

Bell's counsel then objected to a requirement of drug and alcohol treatment under condition 10, again arguing the offense was unrelated to drugs or alcohol. The trial court acknowledged that Bell had no current substance dependency issue but stated: "I will say . . . that if, during the course of [the probation period,] Bell were to develop such an issue, [failure to include condition 10] may foreclose probation from assisting her in receiving the treatment that she may need." The court added that should the probation officer order unnecessary treatment, Bell could ask the court to remove the condition. Bell's counsel responded, "I'll submit to the [c]ourt's discretion, Your Honor." The court proceeded to impose various conditions, including condition 9 (as modified to require a breath test only) and condition 10.

14

*B. Analysis*

We conclude Bell forfeited her challenges to conditions 9 and 10. Although she initially objected to these conditions, she withdrew her objections following discussions with the trial court. In response to argument by Bell's counsel about condition 9 (chemical testing), the court indicated it was inclined to narrow it to breath tests, to which counsel replied: "Okay. That's fine. Thank you, Your Honor." As for condition 10 (substance-abuse treatment), the court explained why the condition would be beneficial to Bell, to which her counsel responded, "I'll submit to the [c]ourt's discretion." Counsel did not simply resign himself to the court's rulings—his statements came before any definitive ruling and in response to substantive discussions with the court. At the time of the court's rulings, there were no objections pending as to the relevant conditions. Thus, Bell forfeited her challenges to them. (*People v. Welch* (1993) 5 Cal.4th 228, 235 [failure to object to probation conditions constitutes forfeiture].)

*People v. Appleton* (2016) 245 Cal.App.4th 717, cited by Bell, is inapposite. There, the defendant objected to certain probation conditions and reiterated his objections even after the trial court imposed them and the defendant accepted probation. (*Id.* at p. 721.) When the defendant challenged the relevant conditions on appeal, the Attorney General argued he had forfeited his claims by accepting the grant of probation. (*Id.* at p. 723.) The Court of Appeal rejected this contention and stated: "[H]aving made his objections known, defendant was not required to reject probation to preserve his claims for appeal." (*Ibid.*) Unlike the defendant there, Bell affirmatively withdrew her objections and did not merely accept the grant of probation. Accordingly, she forfeited her claims.

15

## DISPOSITION

The judgment is affirmed. The clerk of the trial court is ordered to prepare amended minutes of the April 21, 2023, sentencing hearing to delete the order that appellant may not consume alcoholic beverages and may not be present in any establishment where the primary items for sale are alcoholic beverages.

O'LEARY, P. J.

WE CONCUR:

MOORE, J.

GOODING, J.