Filed 11/1/24 P. v. Pemberton CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEREMY PEMBERTON,<br><br>    Defendant and Appellant. | 2d Crim. No. B326488<br>(Super. Ct. No. 20F-02244)<br>(San Luis Obispo County)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on October 14, 2024, be modified as follows:

1.  On page 9, the first sentence of the first full paragraph, beginning "Finally, even if" is deleted and the following two sentences are inserted in its place:

> "In his petition for rehearing, Pemberton argues that there is no confusion in the minutes which accurately reflect what occurred.  Assuming that is the case, nothing changes."

Appellant's petition for rehearing is denied.
There is no change in the judgment.

_____

GILBERT, P.J.        YEGAN, J.        CODY, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEREMY PEMBERTON,<br><br>    Defendant and Appellant. | 2d Crim. No. B326488<br>(Super. Ct. No. 20F-02244)<br>(San Luis Obispo County) |

Jeremy Pemberton was convicted by a jury of two counts of sale of a security by means of a false or misleading statement or omission (Corp. Code, § 25401; counts 1 & 2), one count of theft from an elder (Pen. Code, § 368, subd. (d); count 3) and two counts of theft by false pretenses (*id*., § 487, subd. (a); counts 4 & 5).  The jury also found true that all five counts were related felonies with a material element of fraud involving a pattern of felony conduct and the taking of more than $500,000.  (*Id*., § 186.11, subd. (a)(2).)

On count 1, the trial court sentenced Pemberton to the low term of two years, plus a consecutive two years for the multiple

felony fraud enhancement.  The court imposed the same sentence on count 2 to run concurrently with the sentence on count 1.  On counts 3, 4, and 5, the court imposed two year terms on each count, stayed pursuant to Penal Code section 654.  We affirm.

FACTS

*The Project*

In 2015, Pemberton had plans to open an entertainment facility in the City of San Luis Obispo called Discovery San Luis Obispo (the Project).  The facility would offer bowling, dining, and music.  Pemberton operated a similar facility in Ventura County.

Pursuant to the plan, on March 1, 2015, Pemberton entered into a lease of a building in downtown San Luis Obispo with Jamestown Properties (Jamestown).  The building was an empty shell.  Under the lease Pemberton would pay for improvements.

The Project was supposed to open by the end of 2015.  But Pemberton was experiencing various delays, including the unanticipated need for seismic retrofitting of the building.  Jamestown refused to pay for the seismic work, pointing out that under the lease such improvements were Pemberton's responsibility.

In the meantime, Pemberton was not paying rent on his lease of the building.  As of January 2017, he owed approximately $616,000 in back rent.  On January 12, 2017, Jamestown notified Pemberton that unless the back rent was paid in five days he would be in default.

On April 25, 2017, Jamestown filed an unlawful detainer action against Pemberton.  Pemberton surrendered possession of the premises on May 22, 2017.  In July 2017, Jamestown filed a civil action against Pemberton for breach of lease and back rent.  Pemberton continued to negotiate with Jamestown for what

2

Pemberton describes as an amended lease. But the negotiations proved unsuccessful.

*The Crawfords*

Pemberton met Joanne and Jacob Crawford, an elderly couple, through their son, a financial consultant. In June 2015, the Crawfords invested $160,000 in the Project. Pemberton told them that there were other investors, but he did not say who they were. The Crawfords believed that the Project would be open by 2016.

Throughout 2016, the Crawfords, through their son, contacted Pemberton to inquire why no construction progress was being made. Pemberton assured them that construction would begin soon, or blamed the City of San Luis Obispo for the delays or simply did not respond to their e-mails.

In January 2017, Pemberton sent a letter to the Crawfords stating that he was still fundraising. He claimed that he raised $825,000 from an investor in Ventura and that the landlord required 100 percent of the funding be secured before the start of construction.

In August 2017, Pemberton represented to the Crawfords he needed only $200,000 more to fully fund the Project. The Crawfords agreed to supply the $200,000 as a loan. Pemberton sent a promissory note bearing interest at 14 percent, payable in three years. If Pemberton could not start the Project, the money was to be returned. Pemberton told the Crawfords that they were wiring the money into an escrow account, but the account was controlled by Pemberton.

At the time the Crawfords funded the loan, Pemberton had not disclosed that he had lost the lease and was being sued for over $600,000 in back rent. Pemberton later told the Crawfords

the Project was dead.  The Crawfords never recovered any of their money.

*Carlos Fajardo*

In 2017 Carlos Fajardo was a business investor.  A real estate agent referred him to Pemberton.  In the middle of 2017, he met with Pemberton about investing in the Project.  They toured the building.  A custodian let them in because Pemberton had surrendered the keys when he lost the lease.  The building was empty.  Pemberton told Fajardo that he had a good relationship with the landlord and that the landlord was excited for Pemberton to get started.

In August 2017, after the lease was terminated and the lawsuit filed for back rent, Pemberton told Fajardo that he needed $500,000 to complete funding for the Project.  Fajardo became a limited partner in the Project.  Fajardo wired $500,000 into what he thought was an escrow account.  The limited partnership agreement had a paragraph entitled "escrow," stating that the money would be held in a segregated account at Bank of America.  The instructions Pemberton gave him for wiring the money stated "escrow account number" followed by an account number with Bank of America.  In fact, the account was controlled by Pemberton.

After Fajardo wired the money, Pemberton asked him for more money.  Fajardo became concerned because Pemberton had told him that the $500,000 he sent was the last amount needed to fully fund the Project.

Pemberton never disclosed that he lost the lease or that he was being sued by the lessor for the back rent.  Fajardo would not have made the investment had he known.  Fajardo never recovered any of his money.

4

*Forensic Accounting*

Forensic accounting conducted by a district attorney's investigator showed Pemberton used the money deposited by the Crawfords and Fajardo for his personal non-business related expenses. The money was used for trips to Cabo San Lucas, Maui and the Diamante Resort in Mexico; lodging in San Francisco, Los Angeles, Santa Barbara, Florida, Spain, and Mexico; Elton John concert tickets; and Tony Robbins motivational materials, among other uses.

*Defense*

Pemberton testified in his own defense. He blamed the delay in starting the Project on difficulty in dealing with a new Jamestown manager, on the unanticipated need for seismic upgrades to the building, and on local citizen's protests causing a delay in the City's approval of the Project.

Pemberton claimed that he was negotiating with Jamestown over the back rent he owed when he was stunned to get Jamestown's default notice. He continued to negotiate with Jamestown after he got the termination letter. Even after the termination letter, Pemberton said he felt good about the Project because he was getting support from David Frewing of U.S. Bowling.

Pemberton denied that in raising money for the Project he concealed from the Crawfords or Fajardo that he lost the lease or that Jamestown was suing him for back rent.

The terms of the limited partnership agreement allowed Pemberton to move the Project to a different location. Pemberton contacted the City of Bakersfield about purchasing a parcel of land from the city. Pemberton received a non-binding letter of intent from the city. But the negotiations collapsed when the city

found out about Jamestown's lawsuit against Pemberton for back rent. Pemberton also claimed that he was close to beginning operations in Austin, Texas, but he could not proceed because criminal charges were filed against him in this case.

Pemberton testified that he spent the money deposited by the Crawfords and Fajardo for business purposes. He said the trip to Cabo San Lucas was a business expense because it was a prize to the highest salesperson at Discovery Ventura. The Elton John concert tickets were a business expense because the intent was to sell them on the secondary market. The Maui expenses were for a development team retreat. The lodging expenses were for research at various locations. Pemberton insisted that the Tony Robbins seminars were also business related.

David Frewing testified for Pemberton. Frewing is president of U.S. Bowling, a manufacturer of bowling equipment. Frewing said he loaned money to Pemberton for the Project. Frewing also wrote a letter to Jamestown stating that he was fully committed to the Project. Frewing attached a financial statement showing that he had $30 million in assets.

## DISCUSSION

### I. Due Process

Pemberton contends that he was denied due process when the trial court failed to give his counsel notice before answering one of the jury's questions.

Before sending the jury to deliberate, the trial court met with counsel. The court stated it would call counsel if the jury asked any questions. The court requested that counsel be available within 15 minutes to respond to any question the jury might have. Neither counsel objected nor asked for more time.

6

During deliberations, the jury asked the trial court if it could have a definition of "fiduciary" or "escrow account." The court answered no. The terms were not defined in the jury instructions.

Pemberton argues the record does not show that his counsel was notified that the jury had a question. But it is not enough that the record may not show notice. All intendents and presumptions are indulged to support the judgment on matters on which the record is silent, and error must be affirmatively shown. (*Dunham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

Here the record shows the trial court said it would notify counsel if the jury had a question. Nothing in the record shows the court failed to do so.

Pemberton points out that the record shows only 15 minutes elapsed between the jury's question and the trial court's answer. He believes a reasonable interference can be drawn counsel was not notified because counsel would have only 15 minutes to appear in court. But 15 minutes is the amount of time the court told counsel it would give them to appear. If anything, it shows the court did what it said it would do.

Pemberton argues that the minute order concerning a subsequent jury question reflects that the parties discussed the question before responding; whereas the minute order for the first jury question reflects no such discussion. Pemberton concludes that there was no discussion because his counsel was not notified.

Pemberton cites no authority requiring the clerk to be absolutely consistent in recording the minutes. What is consistent is that the minutes for neither jury question affirmatively state that counsel was notified. It is quite possible

that the minutes relating to the first jury question do not reflect a discussion because the trial court and the parties dismissed the question out of hand without substantial discussion. That would explain why only 15 minutes elapsed between the question and the response.

Moreover, the clerk's minutes are not a model of clarity. The jury asked the second question at 4:54 p.m. The clerk's minutes for the next day begin with the statement that the jurors are present at 9:00 a.m. and resume deliberations. The next entry is the trial court and counsel's discussion of the jury's question off the record. The following entry is the court's response to the jury's first question at 8:43 a.m., asking the jury to clarify its question. The jury replied at 10:00 a.m. The court answered the question at 10:11 a.m.

It appears from the clerk's minutes that the trial court responded to the jury's first question at 8:43 a.m., prior to the jurors being present at 9:00 a.m. Not only is this highly unlikely, but if the court did so, that should be the first entry of the day. More likely, the court asked the jury for clarification, not at 8:43 a.m., but at 9:43 a.m. That would place the entry in the correct chronological order. It would also reduce the time between the court's request for clarification and the jury's reply from one hour and 15 minutes, to a more probable 15 minutes. More importantly, unlike the 15 minutes between the first question and the court's reply, the court and counsel would have had time to engage in a substantial discussion of the jury's second question. That would explain why the clerk's minutes noted the discussion of the second question but not the first. The clerk's minutes are too ambiguous to rebut the presumption against

error, particularly when the court expressly stated it would give counsel notice if there was a jury question.

Finally, even if the trial court had erred, the error would be harmless by any standard. At most, Pemberton's counsel could have suggested definitions for "escrow" and "fiduciary" with which to instruct the jury. But any reasonable definition of those terms would only serve to emphasize the vast gulf between Pemberton's legal duties and his actions. The court's refusal to give the jury the definitions is the best result Pemberton could have hoped for.

## II. *Mistake of Fact Instruction*

Pemberton contends the trial court erred in denying his request for a mistake of fact instruction. (CALCRIM No. 3406.)

A jury instruction is required only when there is substantial evidence to support it. (*People v. Avila* (2009) 46 Cal.4th 680, 705.) Pemberton argues that there is substantial evidence he was operating under a mistaken belief that he was going to have an amended lease with Jamestown, and soon thereafter would have a viable business in San Luis Obispo.

There is no substantial evidence of a mistake of fact. Pemberton knew that he had lost the lease. He also knew that Jamestown had no obligation to grant him an amended lease. That is why Pemberton was negotiating. Pemberton's estimate of what Jamestown may or may not do at some point in the future was not a mistake of fact; it was a mistake of prognostication.

Pemberton's cites to *People v. Hendrix* (2022) 13 Cal.5th 933 and *People v. Speck* (2022) 74 Cal.App.5th 784, 791-792 fall well below the threshold of mistake of fact. In *Hendrix*, the defendant claimed he was not at a house to burglarize it, but he was there because he mistakenly believed his cousin lived there.

9

(*Hendrix*, *supra*, 13 Cal.5th at p. 937.)  In *Speck* the defendant claimed he thought he was driving the car with the owner's permission; he did not know it was stolen.  (*Speck*, *supra*, 74. Cal.App.5th at p. 788.)  Neither case involves a belief about what may or may not happen in the future.

Moreover, if it was error not to give the instruction, the error was harmless.  That the lease had terminated was not the only material omission or fraudulent representation.  Pemberton omitted to tell his victims that Jamestown was suing him for more than $600,000 in back rent.  He fraudulently represented that the victims' money was the last amount needed for the Project; that the money would be placed in an escrow account; and that if the Project did not go forward, the money would be returned.  It is not reasonably probable that a result more favorable to Pemberton would have occurred in the absence of the error.  (*People v. Watson* (1956) 46 Cal.2d 818, 837.)

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

GILBERT, P. J.

We concur:

YEGAN, J.

CODY, J.

10

Timothy S. Covello, Judge

Superior Court County of San Luis Obispo

_____

Wayne C. Tobin under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.