Filed 12/15/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>AHMED KAMAL ISMAIEL,<br><br>      Defendant and Appellant. | A168277<br><br>(Contra Costa County<br>Super. Ct. No. 05001916733) |

A jury convicted defendant and appellant Ahmed Kamal Ismaiel (appellant) of three offenses based on his actions in arranging to meet a minor for sexual contact via a social media application. The person appellant communicated with was actually a law enforcement officer posing as a minor, and appellant was arrested when he arrived for the meeting. On appeal, appellant contends the trial court incorrectly instructed the jury that a mistake of fact as to the age of the person he communicated with had to be reasonable. Respondent concedes error but argues the error was harmless. We disagree and reverse.

PROCEDURAL BACKGROUND

In August 2019, the Contra Costa County District Attorney filed an information charging appellant with meeting a minor for lewd purposes (Pen. Code, § 288.4, subd. (b); count one);[1] contacting a minor for a sexual offense

---

[1] All undesignated statutory references are to the Penal Code.

1

(§ 288.3, subd. (a); count two); and attempted lewd act upon a child (§§ 288, subd. (c)(1), 664; count three).

In March 2023, a jury convicted appellant of all three counts. In April, the trial court placed appellant on probation for two years with various terms and conditions.

The present appeal followed.

FACTUAL BACKGROUND

In April 2018, Senior Inspector Darryl Holcombe of the Contra Costa County District Attorney's Office was conducting an investigation through the Internet Crimes Against Children Task Force. In that role, Holcombe had a profile on Whisper, a smartphone application. Holcombe was designated an expert "in child exploitation cases involving social media" and the use of the Whisper application. He explained that Whisper is anonymous, does not require users to enter phone numbers or e-mail addresses, and automatically assigns usernames. Users enter an age range and gender, but there is no verification process.

Once users open Whisper, they can choose to focus on posts from users who are "within a very close geographical area." Within the application, users post "whispers" to which other users can respond with their own "whispers" or through direct messages. Users cannot delete individual messages from another user, but they can delete entire message threads. If a user deletes a thread, the other user in the thread could still post a message to the thread, which would "reinitiate" the conversation. However, the user who previously deleted the thread would not have access to the prior messages in the thread.

Holcombe set up a Whisper profile in which his persona was a female user between the ages of 15 and 17 (the only age category for minors). He

pretended to be a 14-year-old girl named Lizzy, who was a sexually inexperienced high school freshman with separated parents. Whisper assigned the username "Iconsborn_dangerous" (hereafter Iconsborn) to Holcombe. As "Iconsborn," Holcombe posted a "whisper" with the words "New to Whisper." Appellant—as a Whisper user calling himself Eddy— contacted "Iconsborn" through a direct message. After some initial back and forth, "Iconsborn" identified herself as Lizzy and asked appellant how old he was; appellant responded that he was 28. Lizzy said she was 14; appellant responded, "Ah lol."[2] Holcombe testified that, in his experience, "a very high percentage of people" would stop talking to him as soon as he gave the age of 14. He also testified that anyone chatting with "Iconsborn" could click on the username and see the age range of 15 to 17 in the profile.

Continuing the chat, appellant asked Iconsborn[3] if she was "on spring break," and she responded that she was and that she was "sleeping a lot hanging with friends." After appellant sent Iconsborn a photo of his cat, Iconsborn responded by sending a photo she identified as herself with her dog. The photo was actually of a Homeland Security agent from New York when she was 14. Appellant complained about having to drive to Modesto the next day and Iconsborn responded, "I can't wait to drive." Appellant said he taught his sister how to drive, and Iconsborn said, "I wanna learn."

---

[2] All errors in grammar, spelling, punctuation, and capitalization in the messages quoted herein appear in the exhibit of those messages.

[3] We will generally refer to the person appellant interacted with on Whisper as "Iconsborn," and use the pronouns "she" and "her," even though the person was actually Holcombe posing as a female minor. And, as explained later in the decision, the name Lizzy was never again repeated in the exchange, and appellant testified he did not have access to the initial exchange and did not realize he was communicating with the person who had identified herself as 14-year-old "Lizzy."

Appellant said that he could teach Iconsborn but added, "You're supposed to have a permit before you get trained though."

Iconsborn asked appellant, "Do u have a gf," and he responded, "Nope," and asked, "You have a bf?" Iconsborn said, "No," and added, "I'm not really allowed to." She explained that her mom was "weird about it" and, in response to appellant's questions, denied that it was "like one of those arranged marriage things" or "a religious thing." She continued, "I mean I've liked guys and hung out with them she just is protective." Iconsborn said she had gone out on a couple dates and to a "school dance" with a guy. Appellant asked, "Anything after that?" and Iconsborn responded, "Kissing." Appellant said, "That's it?" and Iconsborn said, "Yeah that's all I've done." Appellant questioned further, asking, "Is it because you didn't want to?" Iconsborn responded, "I do I just got nervous." Appellant then said, "You're missing out," and "It's the best thing ever lol." Iconsborn responded, "Lol. Probably. Plus he would just tell everyone at school." Appellant said, "So you need it to be a secret," and added, "I can keep secrets." Iconsborn wrote, "That cause u r older," and appellant responded, "That's true[.] . . . Things are more private when you're older."

Iconsborn asked appellant what he looked like and he sent her two photos—in one, he had a bare torso and a towel on the lower half of his body. Iconsborn responded, "Wow. Hot." Appellant wrote that he had "other gifts too" and that he was "much more well equipped than most guys lol." Iconsborn sent another photo, again of a law enforcement officer when she was 14. Appellant responded, "You're on fire," "You woke up my other half," "Down below," and "You better take responsibility for waking him up."

Appellant then asked Iconsborn if she was "allowed to leave the house whenever you want or does your parents not let you?" She answered, "I live

4

with my mom she usually works until 8," and added that she and her sister sometimes had dinner with her dad. Appellant then wrote, "[I]f you want we can mess around this week." Iconsborn answered, "Let me see if I can ditch my sister in the afternoon," and appellant said he would get a "[h]otel room" so they could "mess around."

The next morning, appellant sent Iconsborn two photos with the camera pointed at his groin area; in one, he was wearing only underwear. Iconsborn said she was going to the "mall with mom for a bit." Appellant asked about meeting up in the afternoon, offering again to give a driving lesson and adding, "Then we can have fun after." Appellant commented, "But it's your first time," and Iconsborn wrote, "I might not be good at it," and "I don't wanna get preggo cause yeah that would sux." Appellant responded, "You won't trust me lol," and "I have very good self control and I know when to pull out." Appellant offered to pick Iconsborn up but she said not at her house "[c]aus my older sis may be there."

Appellant and Iconsborn continued to text and made plans to meet up in downtown Pleasant Hill. Appellant promised to have her home by 8:00 p.m. The final text in the thread is appellant announcing his arrival at the meeting place. He was met by law enforcement and detained. A search of his car revealed a brown bag containing a box of condoms and a container of lubricant, purchased about 30 minutes earlier.

Defense Evidence

A woman who had dated appellant for "multiple" years testified that appellant was "very truthful, very rule following," and "a little bit boring." She opined that appellant would not try to have sex with a minor because "[h]e would know that's breaking the law."

Appellant testified he was not interested in having sex with minors, and he had not believed he was arranging a meeting with a 14 year old on Whisper. At the time of trial in 2023, appellant was 37 years old; he lied when he told Iconsborn he was 28 because he did not want to share personal information. When he chatted with Iconsborn in April 2018, he had recently learned his girlfriend was cheating on him; he felt betrayed and downloaded Whisper to look for a casual sexual encounter. When he opened the application, he clicked on Iconsborn's post "New to Whisper" because he thought it was a tutorial. He then clicked on "chat" because he thought it would take him to a "chat room." That led to the chat with Iconsborn; at the same time, he was chatting with eight to twelve other users in response to other posts. He did not care when "Lizzy" said she was 14 because at that point he thought he was in a chat room learning to use Whisper. He also did not believe she was actually 14; he thought she was "messing with" him because he had previously encountered "bots, scammers, just people that want to cause havoc." He also thought a person had to be 18 to use the application.

At the same time he was chatting with Iconsborn, appellant was contacting other people on more than five dating applications, in addition to the eight to twelve other people on Whisper. Appellant testified that he realized at some point "very early" that he was not in a chat room in the thread with Iconsborn and he "went back and deleted" all the "Whispers" "that didn't look dating related." He did not remember all of the threads he deleted, "[b]ut some of them were, going to the movies, looking for someone to hang out with, [N]ew to Whisper was definitely one of them." On cross-examination, he confirmed he deleted the entire thread, not individual messages, but then Iconsborn messaged him again. Appellant testified that,

6

because he had deleted the "New to Whisper" thread and no longer had access to the initial exchanges, he did not know it was "Lizzy," the person who said they were 14, with whom he was making plans to meet.

Appellant testified he did not think that the person in the photos Iconsborn sent was under 18. He also did not think various things she said—such as that she was on spring break, did not have a driver's license, and was sexually inexperienced—necessarily meant that she was a minor. When Iconsborn said she was not allowed to date, he thought it might be a religious issue because, in his culture, "you're not supposed to have a boyfriend or girlfriend. You're supposed to get married before you do any of that."

DISCUSSION

The parties agree the trial court erred by instructing the jury that a mistake of fact is not a defense to the charged offenses unless the mistake is not only actual but reasonable. Respondent argues, however, that appellant has not shown he was prejudiced by the error. We disagree and reverse.

I.    *Additional Background*

Without objection from appellant, the trial court instructed the jury on mistake of fact as follows: "The Defendant is not guilty of the crimes charged in this case, Contacting a Minor with Intent to Commit a Lewd Act, Going to a Meeting with a Minor for a Lewd Purpose, and Attempted Lewd Act on a Child 14 or 15 Years of Age if he did not have the intent or mental state required to commit the crimes because he reasonably did not know a fact or reasonably and mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as he reasonably believed them to be, he did not commit the crimes charged in this case. [¶] If you find that the defendant believed that the person with whom he communicated with over Whisper was 18 years or older and if you find that belief was reasonable, he

7

did not have the specific intent or mental state required for" the charged offenses.

As appellant points out, the prosecutor's closing arguments took full advantage of the instructional error and overwhelmingly focused on the *reasonableness* of appellant's purported belief that Iconsborn was an adult. The prosecutor argued, "Look at every single indicator and then ask yourself: Would a reasonable person presented with this person think that this is an adult? The answer is absolutely, unequivocally no." He finished his closing arguments by stating, "I ask you as a jury, look at the exhibits, look at the evidence, look at these photographs and tell me, tell me whether his belief is reasonable. Ladies and gentlemen, this man is guilty and I ask you to hold him accountable for what he's done."

The prosecutor then returned to the theme in rebuttal, arguing, "How reasonable was his testimony when you consider all the other evidence in this case? When you consider his messages and what he has said in his messages? Is his testimony reasonable?" The prosecutor continued, "I'm going to quote this word a couple times: Reasonable. It is not a defense to the charges to ignore the facts. It is not a defense to the charges to ignore when someone tells you they're 14 or to ignore the hints or signs that someone is a child. It's not a defense. And it's not a defense because it's not reasonable. So that instruction, a mistake of fact, doesn't apply in this case." He then characterized the mistake of fact defense as a "Hail Mary play," and stated regarding defense counsel, "[H]e's asking you to ignore this: Reasonable. That one word that keeps coming back in all of the jury instructions: Reasonable. It doesn't matter if this man gets up there and says he's an alien from another planet that doesn't understand [our] technology. It has to be reasonable. You must act reasonably." Finally, he finished by arguing, "We

8

come back to reasonable, ladies and gentlemen.  We have 12 reasonable jurors about to go back into a room and review this evidence.  This is a child.  No reasonable person would think that that is an adult."

II.    *Legal Background*

Section 288.4, subdivision (a) proscribes arranging "a meeting with a minor or a person [the defendant] believes to be a minor for" a lewd purpose, "motivated by an unnatural or abnormal sexual interest in children."  Section 288.4, subdivision (b) provides for greater punishment for persons who go "to the arranged meeting place at or about the arranged time."  Section 288.3, subdivision (a) provides, "Every person who contacts or communicates with a minor, or attempts to contact or communicate with a minor, who knows or reasonably should know that the person is a minor, with intent to commit [a specified] offense . . . involving the minor shall be punished by imprisonment in the state prison for the term prescribed for an attempt to commit the intended offense."  Finally, section 288, subdivision (a) proscribes "willfully and lewdly commit[ting] any lewd or lascivious act" upon a minor under the age of 14 "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires" of either the perpetrator or the child.  Subdivision (c)(1) proscribes the same conduct as to 14- and 15-year-old victims, provided the perpetrator is at least 10 years older than the victim.  (§ 288, subd. (c)(1).)

"Section 26 codifies the defense of mistake of fact.  It 'provides in pertinent part that persons who "committed the act or made the omission charged under an ignorance or mistake of fact, which disproves a criminal intent," are not criminally liable for the act.' " (*People v. Hanna* (2013) 218 Cal.App.4th 455, 461 (*Hanna*).)  In order for a mistake of fact to "negate the mental state element of a given crime," the defendant must harbor "an actual belief 'in the existence of circumstances, which, if true, would make the act

9

with which the person is charged an innocent act.' " (*People v. Lawson* (2013) 215 Cal.App.4th 108, 115.)  "For general intent crimes, the defendant's mistaken belief must be both actual and reasonable, but if the mental state of the crime is a specific intent or knowledge, then the mistaken belief must only be actual.  [Citations.]  In all cases, however, the defendant's mistaken belief must relate to a set of circumstances which, if existent or true, would make the act charged an innocent act."  (*Ibid.*)

Respondent concedes that all three crimes of which appellant was convicted required a showing of specific intent.  (See *People v. Fromuth* (2016) 2 Cal.App.5th 91, 105–106 ["[s]ection 288.4's specific intent element requires proof that, when he or she arranged the meeting, the defendant intended to engage in sexual conduct with a person he or she believed to be a child"]; *People v. Keister* (2011) 198 Cal.App.4th 442, 449 [section 288.3, subdivision (a) "requires the defendant to contact or communicate with a minor or attempt to do so with the specific intent to commit an enumerated sex offense"]; *Hanna, supra*, 218 Cal.App.4th at pp. 461–462 [attempted violation of section 288 is a specific intent crime].)  Accordingly, respondent further concedes "that the instructions should not have limited the mistaken fact to reasonable mistakes."[4]  As explained in *Hanna* with regard to the attempted lewd act offense, "the defendant must have specifically intended to commit a

---

[4] In response to a supplemental briefing request, respondent confirmed its concession as to section 288.3, subdivision (a), despite the statute's reference to a person who contacts someone they "reasonably should know . . . is a minor."  Echoing appellant's argument, respondent reasons that "the alleged target offense required that appellant have the specific intent to commit a lewd act with a minor," and "[t]he law provides that appellant might have lacked that specific intent if he held an honest but unreasonable belief that the person with whom he was communicating was not a minor." We accept the concession.

lewd act on a child . . . . If defendant's intent was to commit a lewd act on an 18 year old, he cannot by definition be guilty of an attempt to commit a lewd act on a" minor. (*Hanna*, at p. 462.) Thus, the issue we must resolve is whether the instructional error was harmless.

III.   *The Instructional Error Was Not Harmless*

   A.   *Standard of Prejudice*

In *People v. Hendrix* (2022) 13 Cal.5th 933, the California Supreme Court addressed the appropriate analysis for determining if an error in the mistake of fact instructions requires reversal. *Hendrix* declined to resolve the question of what standard of prejudice applies to such an error. The Court first outlined the well-established competing tests: "The 'generally applicable California test for harmless error' is set forth in [*People v. Watson* (1956) 46 Cal.2d 818 (*Watson*)]. [Citation.] Under the *Watson* test, we deem an error harmless unless it is 'reasonably probable' the outcome would have been different in the absence of the error. [Citation.] As a general matter, this test applies to ' " 'incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error.' " ' [Citation.] [¶] 'In contrast, we evaluate the harmlessness of violations of the federal Constitution under the standard set forth in [*Chapman v. California* (1967) 386 U.S. 18 (*Chapman*)].' [Citation.] This 'stricter' standard of review requires reversal unless the error is 'harmless beyond a reasonable doubt.' [Citation.] Among the constitutional errors subject to *Chapman* review is misinstruction of the jury on one or more elements of the offense." (*Hendrix*, at p. 942.) The Supreme Court acknowledged and summarized competing arguments regarding the applicable standard of prejudice but concluded, "Ultimately, . . . we need not resolve this dispute about the proper characterization of the error for purposes of applying *Chapman* or *Watson*,

11

because the erroneous mistake of fact instruction was prejudicial even under the less stringent standard set out in *Watson*." (*Hendrix,* at p. 944.)

Like the Supreme Court in *Hendrix*, we need not decide whether the *Chapman* or *Watson* standard applies because the erroneous instruction was prejudicial even under the less stringent *Watson* standard. Following *Hendrix,* we reach that conclusion because the error went to the heart of the case and because we may not assume no juror would have believed appellant. (*Hendrix*, *supra*, 13 Cal.5th at p. 947.)

"*Watson* instructs a reviewing court to ask whether there is a reasonable probability the jury might have reached a different result had it been instructed correctly. [Citation.] In other words, *Watson* asks the court to imagine what the jury would have done in the counterfactual world in which it received correct instructions. While the court should undertake that task in light of the ' "entire cause, including the evidence" ' [citation], the reviewing court should focus solely on whether 'the error affected the outcome' [citation], not on whether the court personally believes that outcome was correct. The distinction is vitally important. An appellate court may, of course, consider the strength of the evidence against the defendant in determining whether the absence of a single, discrete error at trial would have made a difference to the trial's overall outcome. [Citation.] The court may not, however, rest a harmless error ruling on its own reweighing or reinterpretation of the evidence. These are questions solely for the jury, and a reviewing court must, at bottom, ground its analysis in what the 'jury is likely to have done,' not how the court believes the jury should have analyzed the evidence before it." (*Hendrix*, *supra*, 13 Cal.5th at p. 948.) *Hendrix* specifically observed that it is sufficient for a finding of prejudice that an error might have affected the vote of "at least one juror," because "a hung

12

jury, as opposed to an acquittal, is a 'more favorable' [citation] outcome for purposes of harmless error review under *Watson*." (*Hendrix,* at p. 947 & fn. 6.)

An important dimension of the harmless error analysis in the present case is the proposition that " 'it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*People v. Mumin* (2023) 15 Cal.5th 176, 202 (*Mumin*); see also *People v. Oyler* (2025) 17 Cal.5th 756, 827 [" ' "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact" ' "].)  "[A]s our Supreme Court has made clear on repeated occasions, ' "[g]enerally, 'doubts about the credibility of [an] in-court witness should be left for the jury's resolution.' " [Citation.]  "Except in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution . . . ." ' " (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728.)  Here, the instructional error, when viewed in light of the prosecution's closing arguments, effectively deprived appellant of the jury's resolution of his claim that he actually believed Iconsborn was not a minor.

B.    *Analysis*

As in *Hendrix,* "[t]he potential effect of the error was considerable in this case, where [appellant's] mistake of fact claim was the central disputed issue at trial.  Competing assessments of [appellant's] mental state occupied the vast majority of closing argument." (*Hendrix, supra,* 13 Cal.5th at p. 945.)  Appellant testified he did not know the person he was meeting up with was the "Lizzy" who said she was 14 years old because he deleted the Whisper thread including those details.  He testified he deleted the thread at an early point in their exchange and that the chat continued when Iconsborn

13

messaged him again, but the deleted prior exchanges were not visible to him. The expert testified that was technically possible. In particular, Holcombe testified that, if a user deletes a thread, the other user in the thread can still post a message to the thread, which would "reinitiate" the conversation—and, as appellant claimed occurred, the user who previously deleted the thread would not have access to the prior messages in the thread. Furthermore, appellant testified he was chatting with many different people on Whisper at the same time, as well as chatting with people on a number of other dating applications, which could explain his confusion as to the identity of Iconsborn. And it is true that Iconsborn never again identified herself as "Lizzy" or gave her age after the initial exchanges.

Notably, the prosecutor never directed his argument at whether appellant actually was mistaken as to Iconsborn's age. Instead, he repeatedly argued that any such belief was simply not reasonable, and, therefore, did not constitute a defense. We acknowledge the evidence supporting the mistake of fact defense was not particularly strong. All of appellant's exchanges with Iconsborn at least suggested she was a minor. In particular, she told him that she could not "wait to drive" and his response reflected an assumption she did not have a permit; that she was "not really allowed to" date; that she lived with her mother; that she had to hide it from her parents when she saw boys; that she could only see appellant when her mom was at work and if she wasn't having dinner with her father and was able to "ditch" her sister; that her sister was older and apparently also lived with their mom; that she was sexually inexperienced, having only kissed; and that she had gone to a "school dance" on a date and been reluctant to do more than kissing because "he would just tell everyone at school," both of which suggested she was in high school. Appellant expressly acknowledged her

14

youth and the age difference between them in commenting, "Things are more private when you're older." He asked her if she was "allowed to leave the house whenever you want," which would be a strange question to ask an adult. Additionally, appellant received two photos of a 14-year-old girl; even if it was not impossible to believe that the girl in the photos was over 18, she certainly looks like a minor.[5] Appellant asserts that all those circumstances did not conclusively prove Iconsborn was a minor, but he fails to point to a single thing either he or she said that was more consistent with her being an adult rather than a minor. On the other hand, as appellant testified, it is true that there are young adults who are sexually inexperienced, live with their parents, are subject to parental control, and do not drive.

Based on the above, there is no doubt that any belief appellant held that Iconsborn was an adult was unreasonable. However, "[g]iven the evidence before the jury, there is ' " 'more than an abstract possibility' " ' [citation] that at least one juror thought [appellant] genuinely believed [it to be true] and that this juror or jurors were influenced by the erroneous mistake of fact instruction to discount that belief as unreasonable under the circumstances." (*Hendrix, supra*, 13 Cal.5th at p. 947.) Indeed, the mistake of fact defense assumes the possibility that an individual can act in an illogical (that is, unreasonable) way while still lacking the specific intent required for a conviction. Appellant's testimony was neither physically impossible nor demonstrably false. And as *Hendrix* clarifies, the ultimate question is not whether the jurors could have concluded that appellant was lying about making a mistake, but instead "whether the nature of the

---

[5] Holcombe did not testify the photos were of the same 14-year-old girl, but appellant was led to believe so and it appears possible the photos were of the same girl.

evidence leaves us ' "in serious doubt as to whether the [instructional] error affected the result." ' " (*Hendrix*, at p. 946.)

It is more than a mere possibility that the jury focused entirely on the reasonableness of appellant's purported mistake and did not even consider whether that mistaken belief was "genuinely held." (*Hendrix, supra*, 13 Cal.5th at p. 944.) Accordingly, contrary to respondent's assertion, we do not interpret the verdict as reflecting a finding that the jury disbelieved appellant's testimony. It is clear that, had the jury been properly instructed, the deliberations would have proceeded in a fundamentally different manner, focusing on the credibility of appellant's claim that he genuinely believed Iconsborn was over 18.

In the present case, respecting the jury's role in making credibility determinations means this court may not dismiss the possibility that a juror could have believed appellant. As the Supreme Court recently explained, "Ultimately, it is within the jury's exclusive province to determine whether an inference that may be drawn from the evidence is, in fact, the only reasonable one, a determination that depends on its resolution of conflicting evidence and weighing the credibility of witnesses." (*Mumin, supra*, 15 Cal.5th at p. 202; see also *Hendrix, supra*, 13 Cal.5th at p. 948 ["The court may not, however, rest a harmless error ruling on its own reweighing or reinterpretation of the evidence. These are questions solely for the jury."].) Given the evidence here and the instructional error, strongly reinforced by the prosecutor's arguments, we would "usurp the jury's province," were we to dismiss the possibility that a juror could have believed appellant. (*Mumin*, at p. 202.)

*Hanna, supra*, 218 Cal.App.4th 455, which also involved online communications between an adult defendant and someone posing as a minor,

is distinguishable. The Court of Appeal held the trial court erred in failing to give a mistake of fact instruction because "[t]here was substantial evidence based on which a jury could believe defendant intended to have sexual relations with an 18 year old." (*Id.* at p. 462.) In particular, the minor's profile said she was 18, "she" told the defendant in their online communications that she was sexually experienced, and the defendant told the investigating officer that the minor said she was 18. (*Ibid.*) Nevertheless, the Court of Appeal concluded "it was not reasonably probable defendant would have obtained a more favorable outcome had the court instructed on the mistake-of-fact defense." (*Id.* at p. 463.) The court emphasized that the defendant was informed that the person he was conversing with was 13 (" 'I'm 13 and if that's okay with you' "), that she attended middle school, and that she "lied [on her profile] in order to be able to speak with older men." (*Ibid.*) Those circumstances indicate that the defendant's claim of mistake of fact was even weaker in *Hanna* than in the present case. However, the more fundamental distinction is that the defendant in *Hanna* did *not* testify. Because of that, the Court of Appeal in its prejudice analysis did not have to confront the possibility that jurors believed a defendant's testimony about a mistake of fact, and a finding of harmless error did not risk usurping the jury's role in determining the credibility of the defendant's testimony.

By declining to hold the instructional error harmless, we avoid the error made by the Court of Appeal in *Hendrix*. The issue there was whether the defendant, charged with residential burglary, "mistakenly believed a relevant fact—namely, that the house belonged to his cousin and not to a stranger." (*Hendrix, supra*, 13 Cal.5th at p. 936.) The claim of mistake was made by the defendant in a statement to the police. (*Id.* at p. 937.) In

17

reversing, the Supreme Court observed, "The overall effect of the Court of Appeal's approach was to substitute the court's judgment for that of Hendrix's jury regarding the central question in the case: what Hendrix really believed when he approached the Oxnard house.  It may well be that a properly instructed jury would have agreed with the Court of Appeal's assessment of the evidence.  But it was the jury's assessment, not the Court of Appeal's, to make." (*Hendrix*, *supra*, 13 Cal.5th at p. 949.)  The fact that here the jury's assessment of appellant's credibility is unknown is even more of a reason for this court to be hesitant to find harmless error than the situation in *Hendrix*, where the defendant did not testify.  (*Id.* at pp. 936–937.)

In sum, critical to our harmless error analysis is that appellant testified at trial; the jury heard him give his version of the events and could evaluate his demeanor, which of course an appellate court cannot do.  The courts in *Hendrix* and *Hanna* were faced with the question of whether the defendants were truthful in statements to police officers, but those courts were not required to factor in uncertainty about the jury's evaluation of a defendant's testimony—and even in that context, *Hendrix* counseled caution on the part of appellate courts.  Accordingly, once we acknowledge that the evidence supports the possibility that a juror *could have* found appellant credible, it is clear we cannot find the error harmless even under the *Watson* standard.  To be clear, the issue is not whether it is reasonably probable a juror would have found appellant credible.  Instead, because the evidence creates more than an " ' " 'abstract possibility' " ' " a juror could have found him credible (*Hendrix*, *supra*, 13 Cal.5th at p. 947), the issue is whether there is a reasonable likelihood a juror who believed appellant would have found him not guilty.  As we have explained, the entire focus of the prosecutor's

18

argument was that appellant's belief that Iconsborn was an adult was unreasonable, and the jury had no need to even consider whether appellant genuinely believed she was an adult. But, if a juror believed appellant's testimony, it is highly likely that the juror would have found appellant not guilty if properly instructed regarding unreasonable mistake of fact, because appellant's belief would have negated specific intent as to the charged offenses. (See *Hendrix*, at pp. 948–950.) Accordingly, we reverse.

## DISPOSITION

The trial court's judgment is reversed.


SIMONS, J.


We concur.

JACKSON, P. J.
CHOU, J.


(A168277)


19

## The People v. Ahmed Kamal Ismaiel (A168277)

Trial Court:        Superior Court of California, County of Contra Costa

Trial Judge:        Hon. Rebecca C. Hardie

Counsel:        Elizabeth M. Campbell, under appointment by the Court of Appeal, for Defendant and Appellant.

                       Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Seth K. Schalit and Molly A. Smolen, Deputy Attorneys General, for Plaintiff and Respondent.